JOHN MALLOY & others *vs.* JOHN CARROLL & others.

Suffolk.    May 13, 1930. — September 24, 1930.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, WAIT, SANDERSON, & FIELD, JJ.

*Labor Union. Equity Jurisdiction,* To enforce rights in labor union. *Equity Pleading and Practice,* Master: findings.

The charter of a local labor union in a certain trade was granted to it by an international voluntary association composed of representatives of all the local unions in that trade and provided that the local union should be subordinate to the international association and that its by-laws should conform to the constitution of the association. Certain

provisions of that constitution were as follows: § 3: "The power of this body shall be executive, legislative, judicial and final." § 5: "The judicial powers of this body, when not in session, shall be vested in the President and Executive Board only." § 25: "The Executive Board . . . shall have power to settle all disputes . . . between employers . . . and members of this or subordinate associations. The decision of the Executive Board shall be final, subject to an appeal to the Convention [a meeting of the association] . . . ." § 78: "When a member has any grievance against any local he shall file a copy of complaint with the Secretary-Treasurer . . . thirty days previous to the convening of the Convention." It appeared that the meetings of the association were held biennially. At a time when a meeting of the association was not in session, a dispute arose between two factions of the local union as to the wages for which the members of the union should work. In a suit in equity by certain members of one faction against the union and the association, to establish the rights of the plaintiffs as members of the union, it was *held*, that

(1) The provisions of the constitution of the association above quoted must be construed broadly as reposing all final judicial powers in the convention of the association, when assembled, or in the president and executive board, when the convention was not in session;

(2) In the circumstances, the president and executive board had final judicial jurisdiction of the controversy between the plaintiffs and the defendants;

(3) There was nothing in § 25 inconsistent with such construction of the constitution, since that section related to controversies between employers and members of the association or of the local unions;

(4) There was no inconsistency between such construction and § 78, since § 78 dealt with judicial procedure only and not with judicial jurisdiction over certain types of controversies.

A master to whom the suit in equity above described was referred found that, as a result of a request by the faction opposing the plaintiffs, the association, without notice to the plaintiffs or opportunity being given to them to be heard, sent one of its officials to the city where the local union was, with instructions to remove one of the plaintiffs as president of the union and to appoint one of the opposing faction as president; that the official thereafter purported so to remove that plaintiff from office and to appoint a new president; that the new president purported to appoint several new members of the executive committee of the union; that the executive committee, as thus constituted, purported to try charges preferred against the plaintiffs by one of the opposing faction, although the plaintiffs challenged its authority and withdrew from its meeting; that the executive committee recommended the expulsion of the plaintiffs from the union; that the union accepted such recommendation; that the executive board of the association approved its official's action; that the plaintiffs thereafter appealed to the executive board, setting forth their version of the situation and asking how they "would carry on," to which the president of the association replied stating that, since the plaintiffs had left the union and had organized a "dual local," the board would not

consider their appeal until they again became members in good standing of the union; that thereafter the association refused to recognize the plaintiffs as union men and recognized members of the opposing faction as officers of the union; that any further appeal by the plaintiffs to the association would have been futile; that the plaintiffs had exhausted their remedies within the association and the union before commencing the suit; and that no language of the constitution of the association authorized the association to remove an official of a local union and to appoint another in his place. So far as it was a question of fact, the master concluded that the association had no power to remove the plaintiff president from office; that such removal, the appointment of a new president and the subsequent action taken by the executive committee and the union were invalid; and that the plaintiffs were not in fact expelled from the union. Upon a report of the suit without a report of the evidence, it was *held*, that

(1) The master's finding, that the plaintiffs had exhausted their remedies within the association and the union, was a finding of fact, and there was no merit in an objection to it on the ground that it dealt with a question of law;

(2) There was no error in that finding, since the executive board had final judicial jurisdiction at times when a meeting of the association was not in session;

(3) The master's finding as to the language of the constitution of the association was a finding of fact although it was based on documentary evidence, and it was not open to objection on the ground that it dealt with a question of law;

(4) Even if the master's conclusion, that the plaintiffs were not expelled from the union, was one of law and not within his province, the conclusion was proper as a matter of law;

(5) The master's conclusion, that the association had no power under the constitution to remove the plaintiff president and appoint a new president, was warranted as a conclusion of fact;

(6) The association had no such power as a matter of law;

(7) The findings by the master must stand and they entitled the plaintiffs to relief.

BILL IN EQUITY, filed in the Superior Court on June 11, 1928, and afterwards amended, described in the opinion.

The suit was referred to a master, material portions of whose report, together with decrees entered by order of *Keating*, J., are described in the opinion. The judge reported the suit for determination by this court.

Sections 2–5, 25 and 78 of the constitution of the defendant Operative Plasterers' & Cement Finishers' International Association of the United States and Canada were as follows:

"Section 2. The object of this Association shall be to facilitate the organization of the trade it represents.

"Section 3. The power of this body shall be executive, legislative, judicial and final.

"Section 4. All legislative powers shall be reserved to this Association duly convened in session, and shall extend in every case of legislation not delegated or reserved to subordinate associations.

"Section 5. The judicial powers of this body, when not in session, shall be vested in the President and Executive Board only."

"Section 25. The Executive Board shall have control of all executive business, and shall fill all vacancies. They shall have power to settle all disputes, grievances, lock-outs between employers or exchanges, and members of this or subordinate associations. The decision of the Executive Board shall be final, subject to an appeal to the Convention. When an appeal from the decision of the Executive Board has been taken a copy of said appeal must be furnished to all parties concerned who are members of the O. P. & C. F. I. A. They shall have full and complete control over all strikes and shall have power to issue charters and organize new locals."

"Section 78. When a member has any grievance against any local he shall file a copy of complaint with the Secretary-Treasurer who shall notify the local against whom the grievance has been filed. Said notification must be filed with the Secretary-Treasurer within ninety days from the time grievance occurred, or same will not be considered. Said grievance must be on file with Secretary-Treasurer thirty days previous to the convening of the Convention."

The case was submitted on briefs at the sitting of the court in May, 1930, and afterwards was submitted on briefs to all the Justices.

*P. A. Hendrick*, for the defendants.

*J. B. O'Hare*, for the plaintiffs.

PIERCE, J. This is a bill in equity in which the plaintiffs, John Malloy and Martin D. Farrell, seek to establish their rights as members of the Boston Cement & Asphalt Finishers' Union, Local 534, hereinafter called the union. The defendants John Carroll, Otto B. Nelson, John Erlandson,

Louis Pratt, and Michael O'Rourke, prior to April 30, 1928, were for some years members of the union. The defendant, the United Building Trades Council of Boston and Vicinity, hereinafter called the council, is a voluntary association, composed of five or more members appointed by various trade unions in the field of building construction in and around Boston. The defendant Operative Plasterers' & Cement Finishers' International Association of the United States and Canada, hereinafter called the international, is a voluntary association composed of five or more members who are representatives of the subordinate associations of plasterers' and cement finishers' unions throughout the United States and Canada. Its purpose is to secure unity of action among the trade unions in the plastering and cement finishing lines in building construction throughout the United States and Canada.

The international meets biennially on the second Monday of September. All legislative powers are reserved to the international in convention and extend to every case of legislation not delegated or reserved to subordinate associations. Its judicial powers, when not in convention, are vested in the president and executive board only. The executive board consists of three members, namely, the general president, first vice-president, and secretary-treasurer. The executive board has control of all executive business, and has power to fill all vacancies, and to settle all disputes, grievances and lockouts between employers and members of the international and of subordinate associations. Its decision in these matters is final, subject to an appeal to the convention.

Since May 31, 1915, the union has existed, and is now existing, under and by virtue of a charter granted to it as a voluntary association from the international. This charter provides that the union is subordinate to the international; it stipulates that the union will initiate members according to the constitution adopted by the international and that it may enact by-laws for the government of itself, these by-laws always to conform to the constitution of the international; that in default the charter of the union may

be suspended or dissolved by decision of the international, and that if suspended or dissolved it shall revert to the international. In said charter the international agrees to support the union as a subordinate association.

Following the filing of answers by the defendants, the case was referred to a master who, after hearing the parties and their evidence, filed his report. Thereafter an interlocutory decree was entered restraining the defendants "from interfering with the" plaintiffs "in the performance of their usual trade and calling and from inducing, influencing and coercing persons likely to employ the" plaintiffs "not to employ them, until further order of the court." From this decree the defendants appealed. An interlocutory decree was entered overruling the objections and confirming the master's report, and an order was filed for the entry of a final decree ordering that the plaintiffs be restored as members in good standing of the union, and that the defendants be restrained from interfering with the plaintiffs in the enjoyment of their rights and privileges as members of said union. Thereupon the judge reported the case to this court in the terms which follow: "I report this case to the Supreme Judicial Court on the bill, the answer, master's report, defendants' objections to master's report, decree overruling defendants' objections and confirming master's report and the order for a decree upon a stipulation that if I was warranted in ordering that a decree be entered as ordered then such decree is to be entered; otherwise a decree is to be entered dismissing the bill."

The material facts, in addition to those above set forth, as drawn from the master's report are as follows: In June, 1926, the defendant John Carroll was elected business agent of the union for the term of one year and has continued so to act without further election; as such he is a member of the council and by election or selection is the president thereof. On June 3, 1927, at a meeting called for the purpose, the union duly elected its officers for the period of one year, including the plaintiff John Malloy as president; and John Malloy, as president, appointed eight persons, all members of the union, as the executive board thereof.

Following the election of the officers of the union, in September, 1927, there arose within the union a dispute or controversy as to the meaning and application of the decision of certain arbitrators who had been appointed in the matter of a strike, which became effective on or about April 1, 1926, concerning the right of union members to work for $1.25 per hour, Carroll and his supporters contending that the decision meant that members of the union could not work for less than $1.37½ per hour, while the plaintiff Malloy and his supporters contended that the $1.37½ per hour applied to such members of the union who did waterproofing only and that all other members of the union could work for $1.25 per hour without being considered as working for less than the union scale. This dispute grew in its intensity, and as a result there came into existence in said union two distinct factions, one known as the Malloy faction and the other as the Carroll faction. On December 16, 1927, the union duly voted "That every member must receive $1.37½ per hour and if found working for less charges will be preferred against them." Notwithstanding this vote the Malloy faction continued its efforts "to bring about a situation whereby the members of the union could work for $1.25 per hour whenever they saw fit to do so without being considered as working for less than the union scale of wages." The differences within the union, together with general business conditions, resulted in unemployment of many members and consequent dissension and dissatisfaction between members. Malloy became arbitrary in presiding at meetings of the union and often would put only such questions to a vote as he and the members of his faction favored; and in turn Carroll became arbitrary in many instances when he knew that members of his faction were in the majority at meetings of the union.

On March 24, 1928, Carroll and the members of his faction sent to the international a written request that an international representative be sent to Boston for the purpose of removing from office the president of the union, John Malloy, and of debarring him and five other named members of the union "from attending meetings or any other action the International or its Representative deems necessary for the

welfare of" the union. In response to this request William Brennan, a vice-president of the international, came to Boston, "was allowed to preside at a meeting of the union held on April 3, 1928," pleaded for harmony in the union, and apparently succeeded in bringing it about for the time being. On April 22, 1928, another complaint by telegram was sent to the international by the individual defendants Nelson, Pratt and Carroll. In consequence of this telegram the international again sent Brennan to Boston "with instructions to remove Malloy from the office of President of said union and to bar him and the other members referred to in the foregoing telegram from attending meetings until further notice and to appoint the defendant John Erlandson as president of said union."

On April 27, 1928, the defendant Pratt, who was recording secretary of the union, sent to all members a post-card notice of a special meeting to be held Monday evening, April 30, 1928, which, in terms, purported to be ordered by William A. Brennan in his official capacity. As respects this call and the meeting which followed, the master states that he finds "nothing in the constitution and by-laws of the union or in the constitution of the international which authorizes an international officer to order or call a special meeting of the union." At this special meeting president Malloy opened the meeting and asked what it was called for. Brennan requested permission to preside, saying that he would then answer the question. Malloy refused to yield the chair. A motion was then made and seconded that Brennan be allowed to preside. Malloy refused to put the motion. Brennan then read the telegram of April 22, and said that he granted the request therein contained; that he removed Malloy from the presidency of the union and barred him and the others referred to in the telegram from all rights except the right to work, and that he appointed John Erlandson as president of the union. Malloy refused to yield the chair to either Brennan or Erlandson, and thereupon Carroll, Brennan, Pratt, Nelson, who was financial secretary and treasurer, and a majority of the members then present left the meeting room

and went to another hall in the same building where they continued the meeting with Erlandson in the chair. The original meeting continued with Malloy in the chair, he purporting to appoint officers to take the places of the recording secretary and the financial secretary and treasurer.

Brennan made a written report of his action to McGivern, the president of the international, who with the first vice-president and the secretary-treasurer constitute its executive board. This executive board approved the action of Brennan. Shortly thereafter the plaintiff Martin D. Farrell, who was the temporary financial secretary and treasurer appointed by Malloy in place of Nelson, asked McGivern to make a personal investigation of the trouble and to adjust it. McGivern advised Farrell to enter an appeal with the secretary of the international, and said he would then appoint a member of the executive board to come to Boston to investigate. Pursuant to McGivern's advice Farrell and Malloy sent a written "protest and appeal" to the international. This set forth their version of the trouble and asked in substance how they "would carry on." On May 31, 1928, McGivern replied to this "protest and appeal" by letter, the important parts of which read as follows: "Since my conversation with you over phone I have learned that at the time you talked with me yourself and a number of former members of Local 534 have left that Local and organized a dual local of Cement Finishers in Boston, had I known that of this I assure you that I would not have advised you to enter an appeal as I suggested. If you and your associates felt that you had cause for being dissatisfied with the action of the majority of members of Local 534, you should have remained with the Local and then appealed to the International Executive Board. The executive Board will not take any action on your appeal until you again become members of Local 534 and are placed in good standing by that local with the International, when you have done that I assure you we will give your appeal the consideration that it is entitled to under our laws." Since the date of that letter, May 31, 1928, there has been no further correspondence between

the international and the Malloy faction. The international has continued to recognize the Carroll faction as the union and has had no dealings whatsoever with the Malloy faction.

In the meantime, on May 7, 1928, the defendant Pratt sent notices to Malloy and about thirty-three other members preferring charges against them. These notices charged a violation of rule 27, in that they refused to leave a job when requested to do so by the business agent. They were further notified of the time and place for a hearing of these charges by the executive committee of the union. In addition Malloy received notice of a charge against him of trying to break up the union and of a hearing on such charge to be had before the same executive committee at the time and place appointed in the prior notice. Malloy and most of those so notified, well knowing the character of the charges against them, appeared at the time and place mentioned in said notices, and Malloy, as president of the union, demanded the right to preside at the meeting of the executive committee, but he was refused that right by Erlandson who claimed to be president under the appointment of Brennan. Thereupon Malloy and others of his faction challenged the jurisdiction of the executive committee as then constituted, and withdrew from the meeting. The executive committee heard no evidence in proof of the charges, thus violating section 1, article 7, of the constitution and by-laws of the union, which provides: "All evidence shall be taken down in writing to be read at the regular meeting of Union"; but the committee proceeded to recommend and did recommend to the union the expulsion of the thirty-four members notified to appear before it.

At a meeting of the Carroll faction, held two days later, the executive committee, which purported to try the charges against Malloy and Farrell and thirty-two other members of the Malloy faction, recommended that the men above referred to "be expelled from membership in the union and that each be fined the sum of $50 and that the international secretary be notified of said expulsions and fines. This recommendation was accepted and adopted at said

meeting and it was also voted that in order to be reinstated to membership in the union each of the members so expelled would have to pay a special initiation fee." None of the fines imposed has ever been paid by any of said expelled members. On May 3, Nelson, as secretary of the Carroll faction, notified the Building Trades Employers Association that Malloy and certain other named persons had "been barred from participating in any affairs of Local 534 except the right to work." On May 4, a notice of similar import was sent to the same organization by the council.

In June, 1928, each faction held a meeting and elected officers; those of the Carroll faction have been since July, 1928, recognized by the international as the officers of the union, and those of the Malloy faction have never been recognized since the removal of Malloy as president of the union on April 30, 1928. On June 30, 1928, the international issued a bulletin from its headquarters to all locals containing the names of the thirty-four members of the union who had been expelled and fined $50 each for violating rules. These are the thirty-four members of the Malloy faction whom the union purported to expel and fine at the meeting held May 11, 1928. The international has refused and now refuses to recognize as union labor men Malloy, Farrell and the other eighteen who are now members of the Malloy faction, but classes them as non-union men, although they still keep up their organization and claim to be members of the union. Since April 30, 1928, Carroll, acting as business agent of the union, in several instances has procured the discharge of members of the Malloy faction working at their trades upon the representation that such members were not members of the union but were non-union labor men.

The master finds that the international, acting through its president, relies upon certain sections of the constitution, which he sets forth at length, for authority to instruct its vice-president to remove, and the removal by Brennan of, Malloy as president of the union and his appointment of Erlandson as president in Malloy's place; and "for all other acts by it committed in connection with the affairs of the union"; that "no language either in the constitution

of the International or the constitution and by-laws of the
union . . . expressly, or in terms, authorizes the Inter-
national or any of its officers to remove the president, or
any other officer of a union affiliated with it and appoint
another in his place or stead." The master further found
as a conclusion of fact, so far as such finding is a question
of fact, "that the international, acting by and through
President McGivern and Vice-President Brennan, had no
power or authority under the sections of the constitution
of the international . . . or under the constitution and
by-laws of the union to remove John Malloy from the office
of president of the union and appoint John Erlandson in
his place and stead, and that Malloy was not thereby
removed from said office of president and John Erlandson
was not thereby appointed president of said union, and
that, therefore, John Erlandson was not a member of the
executive board of the union which recommended to the
union that Malloy and Farrell and the thirty-two other
members be expelled and fined, as aforesaid, and that, not
being president of the union, his appointment of Matthew
Degnan and Rocco Roselli as members of said executive
board was invalid; that at the meeting of the executive
board of said union held May 9, 1928, John Malloy, as
president of said union, had the right to preside at the trial
of the accused members except at his own trial; that the
executive board as constituted at said meeting of May 9,
1928, was not the executive board of the union and that
it had no right to make any recommendation as to the
expulsion of, or the imposition of fines upon, the members
summoned or notified to appear before it, and that the
vote of the union on May 11, 1928, accepting and adopting
the recommendation of said executive board, was of no
effect, and that the thirty-four members named in said
recommendation were not in fact expelled from the union
nor were they legally fined in accordance with the provisions
of the constitution and by-laws of said union."

Finding that the international had refused to treat with
the plaintiffs as evidenced by the letter of the international
to the plaintiff Farrell dated May 31, 1928, *supra*, the

master found that any further action by the plaintiffs by way of appeal to the international would have been futile; and that before bringing this bill of complaint the plaintiffs exhausted their remedy within the international and the union.

The defendants filed written objections to the report generally and particularly against specific portions thereof. They made no written requests for rulings of law except such as may be contained or set forth in their objections. The plaintiffs filed neither written objections nor written requests for rulings of law.

The defendants in their brief first present their seventh objection to the report, wherein it is stated "that further action by the plaintiffs by way of appeal to the international would have been futile and before the bringing of this complaint the plaintiffs exhausted their remedy within the international and the union," on the ground that this is a question of law and not of fact; and on the further ground that it appears from the recitals of the master's report that on a written protest an appeal was filed on May 21, 1928, and the only action by the executive board was a notification on May 31, 1928, that the executive board would not take action on the appeal on the ground that while a dual local, not recognized by the international, was being maintained by the plaintiffs, no appeal could be entertained; that, in substance, and effect, this was a direction as to the proper method of procedure which the plaintiffs never undertook to follow. The principle is established by many decisions that the rights of members in organizations such as are now before us must be settled in accordance with the provisions of their constitutions and that every remedy available within such organizations must be exhausted before the aid of a court can be invoked. *Correia* v. *Portuguese Fraternity*, 218 Mass. 305. *Puleio* v. *Sons of Itala & Neighborhood Mutual Benefit Society*, 266 Mass. 328. *Agrippino* v. *Perrotti*, 270 Mass. 55. *Clark* v. *Morgan*, 271 Mass. 164, 171.

While it may be doubtful whether there be any express provision in the constitution of the international or in the

by-laws of the union for an appeal, in such a case as this, to the executive board or to the convention in session, we construe §§ 2, 3, 4, 5 and 78 of the constitution, which are set out in full in the report, in a broad way to manifest with adequate clarity the purpose of reposing all final judicial powers in the convention assembled or in the president and executive board, as the facts require. *Correia* v. *Portuguese Fraternity, supra,* at page 308. In determining the repository of that jurisdiction under §§ 2–5 inclusive of the constitution of the international, it is vital to an accurate interpretation that appropriate emphasis be given to the fact that the convention meets biennially and to the provision of § 5 that "The judicial powers of this body, when not in session, shall be vested in the President and Executive Board only." In view of these circumstances we are of opinion that the president and executive board of the international have final jurisdiction of the judicial powers of the convention when that body is not in session.

There is nothing inconsistent with the opinion herein expressed, namely, that the judicial jurisdiction of the president and executive board is final when the convention is not in session, in § 25, which concerns controversies between employers on the one hand and members of the international or subordinate associations on the other; or in the provision of § 78, which has to do with the establishment of the judicial machinery to be employed rather than in conferring jurisdiction in a given type of cases. There is no indication in the record that there was a convention in session assembled at the time the appeal was made to the president and executive board of the international; consequently, that board had jurisdiction under the provision of § 5 as above interpreted; and, there being no provision for appeal from the board's decision in such a case, the plaintiffs had exhausted all their remedies within the jurisdiction when the board refused to consider their grievances. Even if there had been a right of appeal from the refusal of the executive board to hear the "protest and appeal" to the convention, the master has found that such an appeal would be futile. Such a finding is one of fact, and is within the authority of a master

to make on proper evidence, *Barbrick* v. *Huddell*, 245 Mass. 428, 436; or of an auditor, *Moustakis* v. *Hellenic Orthodox Society*, 261 Mass. 462, 467–468. The evidence is not reported and the finding must stand. "The law does not require a vain form." *Barbrick* v. *Huddell, supra*, at page 436. It will not in such a case as here make a mockery of justice by requiring a party to submit his cause to a tribunal from which he cannot expect the impartiality he may rightfully demand. *Correia* v. *Portuguese Fraternity, supra. Moustakis* v. *Hellenic Orthodox Society, supra. Puleio* v. *Sons of Itala, supra.*

The defendants in their objection numbered eight attack the finding of the master that he finds "no language either in the constitution of the international or the constitution and by-laws of the union which expressly . . . authorizes the international or any of its officers to remove the president, or any other officer of a union affiliated with it and appoint another in his place or stead," on the ground that a question of law based upon the language used in the constitution and by-laws was presented, and not a question of fact. The master's finding was none the less a question of fact because it was based on documentary evidence. The defendants have pointed out no provision of the constitution or by-laws which gives the international or its officers authority to remove from office the president of a subordinate union; and article 11 of the constitution of the union provides that if the president of the union fails faithfully to perform his duties "he shall be penalized as the Union sees fit."

The defendants' objection numbered six is to the general finding "that the thirty-four members named in said recommendation were not in fact expelled from the union nor were they legally fined in accordance with the provisions of the constitution and by-laws of said union," because such finding is a conclusion of law which could not properly be drawn by the master. If obnoxious to such objection, the finding is a true deduction as matter of law.

The defendants' objection numbered one, to the finding, "So far as it is a question of fact I find that the International,

acting by and through President McGivern and Vice-President Brennan, had no power or authority under the sections of the constitution of the international . . . or under the constitution and by-laws of the union to remove John Malloy from the office of President of the Union and appoint John Erlandson in his place and stead," on the ground that the question presented was one of law and not of fact, is unsound.    The undisputed facts show that on the second occasion on which Brennan came to Boston, he came at the instance of the Carroll faction, with orders from the international to oust Malloy from office, and that the decision so to do had been reached after an *ex parte* complaint, with no notice to Malloy and no opportunity afforded him to defend.    Beyond the conclusions of fact which were fully warranted, it is plain as matter of law that there is nothing in the evidence that warranted the action of Brennan or of the president and executive board in removing Malloy.

There is nothing in the remaining objections of the defendants which would justify further consideration of their contention that the plaintiffs were properly expelled and fined in accordance with the written constitution and by-laws of the international and of the union.

The findings of the master must stand and a decree be entered as ordered.

*Decree accordingly.*