LITHUANIAN ALLIANCE OF AMERICA & others *vs.* MOTIEJUS STALIULIONIS & others.

Worcester. September 26, 1933. — October 25, 1933.

Present: CROSBY, PIERCE, FIELD, & DONAHUE, JJ.

*Fraternal Beneficiary Corporation. Voluntary Association. Equity Jurisdiction,* Internal affairs of fraternal organization.

In a suit in equity brought on March 13, 1931, by a fraternal beneficiary corporation, called an Alliance, organized in another State, and by certain persons averred to be officers of a subordinate unincorporated lodge of numerous members, bringing the suit "on their own behalf and on behalf of each and every other member of the said" lodge, a decree was sought directing certain individuals, who asserted themselves to be officers of the lodge, to turn over its property to the lodge and to account for certain funds in their hands to the officers of the Alliance either directly or through the authorized officers of the lodge. From findings by a master to whom the suit was referred, it appeared that there had been serious dissensions both in the parent Alliance and in the lodge; and that the constitution of the Alliance provided a procedure for trial and discipline of members and of subordinate lodges guilty of conduct which was improper under its provisions, and also provided that "No new Lodge shall be instituted within the territory of a Lodge in operation unless consent of such Lodge is first obtained but the Supreme Executive Board may fix

the territorial limits of a Lodge." The master found that the defendants and a faction whom they represented were in possession of the lodge's property and treasury; that they held funds for which they were not accounting to the Alliance as required by the constitution; that on July 6, 1930, they voted to retain dues paid into the treasury of the lodge "until it became clear as to where the money will have to be sent, as at the present time, the old Executive Board is under legal restraint and the new Board has not been finally confirmed and also there are other matters which are not clear"; that on August 22, 1930, they communicated to the Alliance that the lodge and its members were still in good standing under the constitution of the Alliance; that the attitude of the defendants and the members associated with them was to "mark time" and wait and see if the differences in the Alliance were to be adjusted; and that they continued to function "as a club" until November 2, 1930. As to the plaintiffs, the master found that the individual plaintiffs and their faction, following the votes of the defendants' faction on July 6, 1930, met, elected officers of what they called the lodge and thereafter conducted meetings and petitioned the Alliance for a charter; that the Alliance on July 22, without first having procured the assent of the old lodge or having taken steps under the constitution to revoke its charter, granted a new charter to the plaintiffs under the same name as that of the old lodge and installed the individual plaintiffs as officers thereof and thereafter recognized the plaintiffs and their associates as that lodge. On November 2, 1930, the defendants and their faction joined with others in forming a rival corporation made up of seceders from the Alliance. The bill was dismissed. The plaintiffs appealed. *Held*, that

(1) The individual plaintiffs had no standing in the suit, the action of the Alliance when it purported to give a charter for a lodge of which they asserted they were officers being void; and the bill properly was dismissed as to them;

(2) The rule, that, before bringing a suit of the character above described, the plaintiff corporation should exhaust all means of redress given by its constitution and by-laws, did not apply, because the defendants themselves by their secession and joining a rival organization had made redress in the constitutional tribunals an empty form;

(3) The facts found established that the defendants had moneys which were the property of the Alliance and they should be held to account to the Alliance;

(4) The decree was reversed as to the plaintiff Alliance and an accounting to it by the defendants was ordered.

BILL IN EQUITY, filed in the Superior Court on March 13, 1931, and afterwards amended, described in the opinion.

The suit was referred to a master. Material facts found by him are described in the opinion. The master's report was confirmed, and, after a hearing by *Dillon*, J., a final

decree was entered dismissing the bill. The plaintiffs appealed.

*F. J. Bagocius*, for the plaintiffs.

*H. H. Hartwell*, (*L. E. Stockwell* with him,) for the defendants.

PIERCE, J. This is a bill in equity brought by the Lithuanian Alliance of America and Lodge 57 of the Lithuanian Alliance of America by its alleged officers "on their own behalf and on behalf of each and every other member of the said Lodge 57 . . . numbering over three hundred persons, whose names are too numerous to be recited in the caption of this bill as party plaintiffs," against the individual defendants named in the bill of complaint, who were duly elected president and officers of Lodge 57 for the year 1930, for the purpose of compelling the defendants to "turn over and deliver to Lodge 57 of the Lithuanian Alliance of America, through its duly elected and authorized officers the charter, the record books, the seal, the literature, the books in the library and other property contained in or part of the said library and the cash funds, all the property of the said Lithuanian Alliance of America or its subordinate" Lodge 57; and to "account for all moneys collected from January 1, 1930, to the date of the bringing of this bill, from all the members of Lodge 57 . . . and turn over and pay the same to the Supreme Executive Board of the said Lithuanian Alliance of America directly or through the authorized officers of the said subordinate Lodge."

Upon the completion of the pleadings the case was referred to a master under a rule "to hear the parties and their evidence, find the facts, and report to the court his findings together with such facts and questions of law as either party may request." Requests and supplemental requests for findings of fact were made by the plaintiffs and defendants. Certain of these requests for findings of the plaintiff were granted, and others, without designation, were refused by the master, because they were deemed to be immaterial. No exceptions or objections were taken to the master's report, and it was confirmed by an interlocutory decree on the defendants' motion. No appeal was taken from the inter-

locutory decree. A final decree was entered dismissing the bill. The plaintiffs duly appealed from the entry of the final decree to this court. The only issue in this case is whether or not on the master's report the entry of the decree dismissing the bill was proper.

The findings of fact by the master, there being no report of material evidence, have the weight of a special verdict by a jury. Under the rule referring this case the rulings of law made by the master without the request of either party are at most advisory and do not control the decision of the court. *Bradley* v. *Borden*, 223 Mass. 575, 586. *Anglim* v. *Brockton*, 278 Mass. 90, 94.

The material facts found by the master disclose that the Alliance is a fraternal benefit organization incorporated under the laws of the State of Pennsylvania and empowered to transact fraternal benefit insurance, in Massachusetts, in compliance with the provisions of G. L. c. 176. Under its constitution (Exhibit 10) it has a legislative body called the Supreme Assembly which is composed of delegates elected from its subordinate lodges. The Supreme Assembly meets in a convention in some city in the United States designated by the previous convention biennially. Between meetings its business is transacted by a Supreme Executive Board consisting of seven members and the various executive officers, elected at the convention. The Alliance has many lodges and many members in the various States of the United States. Its object is to provide fraternal society insurance to members of the Lithuanian race, both men and women, who join the organization and generally to encourage and promote the education and culture of the Lithuanian race. Under the constitution of the Alliance (art. 5, §§ 4 and 9) the Supreme Executive Board has "full power to organize Subordinate Lodges" and has power "to suspend any Subordinate Lodge found guilty of violating the Constitution, Laws, Rules, or Regulations of the Alliance, and to take possession of all the property, books and moneys from the Lodge so suspended, belonging to the Alliance." "The Constitution provides that the subordinate lodges

shall have possession of and title to its own separate property." (Compare constitution, art. 19, § 11 [2].)

Lodge 57 was organized in Worcester in 1901, and received a charter from the Alliance in 1909. It was not a corporate body, but functioned as an unincorporated branch of the Alliance under the constitution of the Alliance as modified by certain by-laws accepted from time to time by the lodge, and had no separate constitution or a set of by-laws. "Lodge 57 functioned as a subordinate lodge of the Alliance until 1930, when the national organization, at a convention, split into factions. Lodge 57 had a membership of five hundred sixty members." Its "affairs were conducted by its elective officers, consisting of a president, vice president, recording secretary, financial secretary, assistant financial secretary, treasurer and two comptrollers." The "eight defendants were the aforementioned duly elected officers of the lodge for the year 1930, with the exception of Suipenas, who was not an officer." Lodge 57 "functioned as an instrument of government of the Alliance, initiated members into the lodge upon their payment of an initiation fee and taking an obligation as members of the lodge and also as members of the Alliance." "A portion of the initiation fee collected by the lodge from the new members, was payable to the Alliance." "The officers of the lodge also collected and receipted for monthly dues for the different benefits furnished by the Alliance." "They consisted of life insurance, disability insurance, an Alliance expense fund, a children's fund, a national fund and an orphan fund." The various officers of the lodge kept records of its meetings, of its membership and of its finances, on a set of books. The expenses of the lodge were paid by its membership from part of the initiation fees and dues retained by the lodge in accordance with the provisions of the constitution and from profits accruing from various social functions conducted by the lodge, and from voluntary donations. There had been friction between the lodge and the Alliance in the spring of 1930. Charges had been preferred against the lodge and a trial, in accordance with the

constitution, held on those charges. The relations between Lodge 57 and the Alliance had not been interrupted until later in the year. The regular biennial convention of the Supreme Assembly of the Alliance opened in Chicago on June 16, 1930. There were present five hundred twenty-seven delegates. Trouble arose shortly after the convention was opened over the composition of the committee on credentials and the convention got into serious disorder, the police were called in "and two hundred eight delegates were either ejected from the convention hall or left the convention." The three hundred nineteen delegates who remained at the Lithuanian Auditorium claimed to constitute the legal convention of the Alliance; they "elected a Supreme Executive Board and transacted the other business, proper for the convention." The two hundred eight delegates who were ejected or left the auditorium met in another hall in Chicago, called Meldazis Hall, and elected as president one Bacevicius, and, claiming to constitute the legal convention of the Alliance, elected a Supreme Executive Board and transacted the other business proper for the convention. The Bacevicius group adopted a resolution which was transmitted to the Geguzis group then in session at the auditorium. This resolution claimed that the ejected delegates comprised the majority of the duly elected delegates, that the Geguzis convention was not legal, asked that the delegates remaining in the Lithuanian Auditorium join the delegates meeting in the Meldazis Hall and work together for the organization's benefit, on the condition that the convention be reopened with the appointment of delegates of both factions on the credentials committee and other conditions. No conference between the two groups resulted from this resolution and each group continued its convention.

Shortly after the close of the conventions of the two groups, court proceedings were inaugurated by the Bacevicius group to contest the validity of the action of the convention presided over by Geguzis at the Lithuanian Auditorium. There was no evidence before the master of the outcome of these court proceedings, other than a state-

ment by counsel for the plaintiffs at the hearing of this suit
that these court proceedings brought in Chicago by the
Bacevicius group were discontinued by it some time later
in the year 1930; and also a statement appearing in a re-
solve adopted at a meeting held July 6, 1930, of Lodge 57
that on that date "the old Executive Board is under legal
restraint and the new Board has not been finally con-
firmed."

The master further found that about September, 1930,
the Bacevicius group began the organization of a new fra-
ternal corporation.   Its general aims and purposes were
the same as those of the Alliance.   This organization was
chartered by the State of New York on July 7, 1931, and
empowered to engage in fraternal society insurance; it has
as yet no authority to transact business in Massachusetts.
The organization is called the Lithuanian Workers of
America.

Lodge 57 had elected and sent nineteen delegates to the
Supreme Assembly which met at Chicago.   The eight de-
fendants were members of this delegation, and all the
delegates from Lodge 57 participated in the group which
met in Meldazis Hall and elected as president Bacevicius
and that group of officers.   The first meeting of Lodge 57
following the convention at Chicago was held on July 6,
1930.   One hundred thirty of its membership of five hun-
dred sixty were present.   No special notice of the matters
to be acted upon at this meeting was sent to its members.
A report of its delegates to the Supreme Assembly was
heard and adopted.   This report recites the events leading
up to the trouble in the convention which opened in the
Lithuanian Auditorium with President Geguzis presiding,
and blames and censures him and the officers of the execu-
tive committee for what it contends was illegal, unconsti-
tutional action; and further narrates the action taken by
the convention held in Meldazis Hall where President
Bacevicius presided, and it gave the list of officers elected
with Bacevicius by that convention as the duly elected
officers of the Alliance.   This report was accepted by Lodge
57 by a vote of one hundred nineteen in favor of accepting

it; nine voted against accepting it, and a few refrained from voting.

Following the acceptance of the report one Bernota, a member of Lodge 57, called upon all who favored the old executive board elected by the Geguzis group to leave the meeting hall, and Bernota and three others then left the meeting of Lodge 57. Bernota and other members of Lodge 57 shortly afterwards met and elected the nine plaintiffs as the executive officers of what they called Lodge 57 of the Lithuanian Alliance of America; they conducted meetings in Worcester at a different meeting place from the hall previously used by Lodge 57. About two hundred seventy-eight of the five hundred sixty members of Lodge 57 have joined that group which has petitioned the Alliance for a charter as a lodge of the Alliance, and the Alliance has issued to it a charter designating it as Lodge 57. On July 22, 1930, the Alliance formally installed the plaintiffs as executive officers of Lodge 57 and have since recognized them and their group as Lodge 57.

After Bernota and his followers left the meeting of Lodge 57 held on July 6, 1930, the lodge adopted a resolution which reads: "1. Condemning President Geguzis for his alleged unlawful conduct in appointing a committee on credentials at the convention of June 18. 2. Condemned Geguzis and the members of the Alliance's executive board for calling in police and gangsters and throwing out of the convention over two hundred elected delegates of the lodges. 3. It expressed distrust of Geguzis and the executive board for squandering great sums of the Alliance's funds and with negligence in regard to the many affairs of the Alliance. 4. It condemned Geguzis and the executive board for their alleged unconstitutional acts at the convention and stated 'that it does not acknowledge as legal and binding the convention held in the Lithuanian Auditorium, holding it as being completely in the minority and therefore do[es] not acknowledge the decisions and ratifications of that convention; that it held, and approved as legal, the convention of the delegates held in Meldazis Hall and approved the executive board elected by that convention as the persons

receiving the majority of the votes in the elections.' It invited all lodges of the Alliance and individual members, to demand that Geguzis and the executive board and all their committees, formally vacate their positions in favor of the newly elected executive members and committees. It demanded that books, documents and other property of the Lithuanian Alliance of America be turned over in full and complete order to the new executive board. This resolution was adopted by Lodge 57." At this meeting of July 6 the lodge unanimously resolved: "That dues paid by the members, be retained in the Lodge's treasury until it became clear as to where the money will have to be sent, as at the present time, the old Executive Board is under legal restraint and the new Board has not been finally confirmed and also there are other matters which are not clear." This meeting also resolved that the lodge's standing committee consult an attorney as to what line of action the lodge should take in its dealings with the executive board and also as to the rights and sick benefits of the members.

The eight defendants did not resign their respective offices to which they had been elected in the year 1930; neither the defendants nor any of the two hundred fifty-two members of Lodge 57 resigned membership in the Alliance. The two hundred fifty-two members of the Alliance who composed the group of which the defendants were the officers continued to function as a club until November 2, 1930. At that time the two hundred fifty-two members, who had been members of Lodge 57, and members of the Alliance, directed the executive committee of this Lodge 57 to join with other groups who were forming the organization, which was later incorporated (July 7, 1931) and called the Lithuanian Workers of America. Up to and through July 22, 1930, the defendants and the group of two hundred fifty-two members of Lodge 57 did not ally themselves with any outside organization nor attempt to carry Lodge 57 over into any outside organization.

On August 22, 1930, the executive committee of the group of which the defendants were members, in a communication to the Alliance, asserted that Lodge 57 and its members were

still in good standing under the constitution of the Alliance. The attitude of the defendants and the two hundred fifty-two members associated with them was to mark time and wait and see if the differences in the Alliance were to be adjusted. The defendants retained the dues paid them by the members of their group under an agreement with the individual members that these moneys would be withheld until later orders. They had no authority under the constitution to make such an agreement, and the lodge had no authority under the constitution to adopt the resolution, above quoted, at the meeting of July 6, to retain the dues paid by the members of the lodge's treasury. Lodge 57 did not secede from the Alliance at any time prior to July 22, 1930; the individual defendants did not secede from the Alliance at any time prior to July 22, 1930.

The constitution of the Alliance provided for a procedure of discipline of Lodge 57, and for a procedure of discipline of the defendants as members of Lodge 57 and as members of the Alliance. The constitution (Exhibit 10 at page 16, art. 7, § 3, and at page 19, art. 7, § 6, subsection 2) makes provision for members of the Alliance who have been members of a lodge which has been dissolved; at page 25, art. 11, § 3, it provides that "No new Lodge shall be instituted within the territory of a Lodge in operation unless consent of such Lodge is first obtained but the Supreme Executive Board may fix the territorial limits of a Lodge"; at page 30, art. 13, § 3, it is provided that a lodge shall be subject to charges, trial and punishment for any of the offences outlined in art. 13; and by art. 15, and by various sections and subsections, provision is made for the jurisdiction, practice and procedure in trials, the notice required to be given of the form of charges, the practice at the trial, the punishment and for appeal. The Alliance failed to comply with any of these requirements of the constitution before the meeting of July 22, 1930, when it inducted the officers elected by the Bernota group and conferred upon them a charter as a subordinate lodge of the Alliance. The only notice of disciplinary measures taken against Lodge 57 or its defendant officers was a notice from the secretary of the executive

committee of the Alliance to the effect that by a decision of the executive committee reported September 3, 1930, Lodge 57 was suspended for failure to forward Alliance dues for the months of July, August and September. The master further found that the suspension based on this ground was irregular. The constitution, art. 12, § 1, and subsection 3, provides for suspension and notice of suspension for failure on the part of the lodge to pay its dues for three months; and art. 19, § 10, subsection 1, provides for the transmission of moneys and dues collected to the treasurer of the lodge, and § 11, subsection 1 required the lodge treasurer to transmit to the Alliance "all moneys due and collected for or on account of the Alliance to the Supreme Treasurer on or before the 20th day of the month in which such moneys are collected." At the time of the election of the plaintiffs on July 22, 1930, as officers of Lodge 57, there were then existing no vacancies in those offices. The action of the Alliance and the group represented by the plaintiffs was irregular and not in conformity with the requirements of the constitution and such action on July 22, 1930, dissolved Lodge 57. Before the commencement of this suit (on March 13, 1931), due and proper demand on behalf of both plaintiffs had been made by attorney for the plaintiffs upon the defendants. The master also found that the defendants are under no obligation to account to the plaintiff Alliance for any of the moneys or property described in the bill; that the individual plaintiffs do not represent that association which consisted of five hundred sixty members, who, prior to July 22, 1930, constituted Lodge 57; that the defendants are under no obligation to account to the individual plaintiffs for any of the money or property described in the plaintiffs' bill; that under the pleadings in this suit the defendants appear only as individuals and do not represent the association which consisted of the five hundred sixty members who prior to July 22, 1930, constituted Lodge 57; that the plaintiff Alliance is under no obligation to account to any of the defendants in this action; and that the individual plaintiffs are under no obligation to account to any of the defendants in this action.

Upon the facts found by the master and above stated, we think the findings that neither the defendants nor any of the two hundred fifty-two members of Lodge 57 resigned membership in the Alliance but continued to function "as a club" until November 2, 1930, when the entire membership of two hundred fifty-two joined with others in forming another organization called the Lithuanian Workers of America, in their literal sense are true, and in a more fundamental sense cannot in law be said to be clearly wrong, in view of the finding that the attitude of the defendants and the two hundred fifty-two members associated with them was to mark time and wait and see whether the differences between the two groups in the Alliance were to be adjusted. With greater difficulty, and for the reason that as matter of law the findings cannot be ruled to be clearly wrong, we think on extreme technical grounds the finding that Lodge 57 (those who composed that lodge after July 6, 1930) did not secede, that is, withdraw from the Alliance prior to July 22, 1930, and that the individual defendants did not withdraw from the Alliance prior to July 22, 1930, can be supported. We think the provision of the constitution, art. 11, § 3, that no new lodge shall be instituted within the territory of a lodge in operation unless consent of such lodge is first obtained, controlled any action of the Alliance. It follows that under the constitution before the group represented by the plaintiffs could legally be constituted a lodge of the Alliance and the individual plaintiffs inducted into office in territory of a lodge in operation, it was necessary that such lodge should consent thereto, or that there should have been a revocation of the lodge charter. Because none of these essential and fundamental steps were taken it is plain the issuance of the charter and the induction of the plaintiffs as officers of Lodge 57 were a nullity and that the plaintiffs as individuals or as representatives of the two hundred seventy-eight members who prior to July 22, 1930, were seceding members of Lodge 57 of the Alliance, have no standing as plaintiffs in this suit.

Assuming, however, that the defendants neither resigned nor seceded from Lodge 57 of the Alliance until November

2, 1930, they, as officers of Lodge 57, under the constitution of the Alliance were to receive, and the facts found show that they did receive, from the two hundred fifty-two members of Lodge 57 moneys in the form of dues which they were required to transmit through the lodge treasurer to the supreme treasurer on or before the twentieth day of the month in which such moneys are collected.   The defendants contend that the provision of the constitution of the Alliance imposing a penalty or suspension if a lodge shall not have paid its dues for three months and transmitted to the Alliance the dues received from members of the lodge before the twentieth day of the month in which such sums are collected limits the enforcement of the right of the Alliance to collect these dues and charges, and excludes an action at law or suit in equity except by way of appeal after resort to the tribunals provided by the constitution. Such is the usual rule in this Commonwealth.   *Mulcahy* v. *Huddell*, 272 Mass. 539, 544.   *Malloy* v. *Carroll*, 272 Mass. 524, 536.   But it is inapplicable to the facts found that the defendants and the entire membership of Lodge 57 of the Alliance withdrew from their association with the Alliance on November 2, 1930, and joined a rival organization which was later incorporated and called Lithuanian Workers of America.   On November 2, 1930, it is plain the Alliance had not lost any right to pursue the defendants and the members of Lodge 57 in the tribunals provided by the constitution of the Alliance, but it is indisputed that after the secession of the defendants and all the members of Lodge 57, that constitution had no penalty that its tribunals could enforce through the power they had of suspension or revocation of the charter of the lodge to compel the defendants to turn over the moneys which they held of the Alliance.   In a word, the defendants themselves had by their secession from Lodge 57 and from the Alliance made redress in the constitutional tribunals an empty form.   In these circumstances the Alliance could seek relief against the defendants only in an action at law or suit in equity, as the facts may seem appropriate.   The facts found establish that the defendants have moneys which

are the property of the Alliance and they should be held to account to the Alliance.

There is no merit in the ruling of the master that the action of the Alliance on July 22, 1930, dissolved Lodge 57, as the defendants contend on the ground of estoppel. The finding or ruling is inconsistent with the findings or rulings that the defendants and members of Lodge 57 did not resign from the Alliance. So long at least as the defendants and members of the lodge were affiliated with the Alliance they were entitled to the benefits of the organization and had to meet the obligations imposed on them by the constitution of the Alliance.

The decree is reversed as. to the plaintiff Alliance, and affirmed as to the individual plaintiffs, and an accounting is to be had upon the facts found by the master supplemented by further facts as the Superior Court may determine.

*Decree accordingly.*