[No. 29792. *En Banc.* November 25, 1946.]

HOWARD A. LEO *et al., Appellants,* v. LOCAL UNION No. 612 OF INTERNATIONAL UNION OF OPERATING ENGINEERS *et al., Respondents.*[1]

[1]Reported in 174 P. (2d) 523.

*Henderson, Carnahan & Thompson,* for appellants.

*L. Presley Gill,* for respondents.

JEFFERS, J.—The plaintiffs, Howard A. Leo, Fred E. Brown, and J. B. Burns, originally instituted these actions separately against Local Union No. 612 of International Union of Operating Engineers, James Estep, as president thereof, and Earl Palmatier, as business agent and financial secretary thereof, to secure their reinstatement as members of defendant union, and for damages sustained by them as a result of their alleged expulsion from the union, which expulsion had been preceded by the loss of their employment upon demand of the union. Upon stipulation of the parties, the actions were consolidated for trial purposes only. After the court had filed a memorandum opinion, but before the entry of judgment, the three cases were, on stipulation, consolidated for all purposes, and the trial court made and entered single findings of fact, conclusions of law, and judgment.

The Leo complaint asks for damages against the union from October 7, 1942, the alleged date that his compensation ceased, to the date of trial, based on a weekly compensation of $72.80, less any sums received by him from other employment.

The Brown complaint asks for damages from October 7, 1942, to the date of trial, based on a weekly wage of $83.72, less any sum received by him from other employment.

The Burns complaint seeks to recover judgment for damages sustained from October 7, 1942, to the date of trial,

based on a weekly wage of $70.98, less any sums received from other employment.

The cause came on for hearing before the court on November 27, 1944. Some twenty-seven witnesses were called and testified. On December 18, 1944, the trial court filed its memorandum opinion, and on July 11, 1945, the court made and entered findings of fact, conclusions of law, and judgment. Plaintiffs appealed from the judgment entered. Defendants took no cross-appeal.

In view of the questions raised by plaintiffs, we shall refer to the judgment entered. The court awarded Leo judgment against Local No. 612 for the sum of $218.40. This allowance was based upon finding No. 13, which states:

"That the Seattle-Tacoma shipyards continued in full operation at all times from October 7, 1942 to November 1, 1944. That had the plaintiff Howard A. Leo continued in the occupation in which he was engaged at the time of his discharge from October 12, 1942 to October 1, 1944 he would have earned as wages the total sum of $7,498.40. That during said period the said plaintiff Howard A. Leo exercised reasonable diligence to secure other employment, and that during said period he earned the total sum of $2,450.00. That during the period from October 12, 1942 to November 2, 1942 the plaintiff Howard A. Leo, by reason of his expulsion from the defendant union, was damaged in the sum of $218.40."

The court awarded plaintiff Fred E. Brown damages in the sum of $306.96. This award was based on the following facts found in finding No. 14:

"That had the plaintiff Fred E. Brown continued in the occupation in which he was engaged at the time of his discharge from October 7, 1942 to November 1, 1944 he would have earned as wages the total sum of $8,958.04. That during said period the said plaintiff exercised due diligence to secure other employment and that he earned during said period the total sum of $4,310.84. That during the period from October 6, 1942 to Nov. 2, 1942 the plaintiff Fred E. Brown, by reason of his expulsion from the defendant union, was damaged in the sum of $306.96."

The court entered judgment in favor of J. B. Burns for the sum of $118.30. This amount was arrived at as follows:

"That had the plaintiff J. B. Burns continued in the occupation in which he was engaged at the time of his discharge from October 7, 1942 to November 1, 1944 he would have earned the total wages of $7,594.86. That during said period the said plaintiff exercised due diligence to secure other employment and mitigate damages and that he earned during said period the total sum of $1,573.66. That during the period from October 7, 1942 to October 19, 1942 the plaintiff J. B. Burns, by reason of his expulsion from the defendant union, was damaged in the sum of $118.30."

We do not mean to state that the above findings of fact are all the findings upon which the judgment is based, but they are the findings relative to the amount earned by the respective plaintiffs, and time for which the court allowed damages.

As to Leo and Brown, the court allowed them damages to November 2, 1942, on which date a purported trial was had within the union, as a result of which the union purported to expel them. Burns was allowed damages to October 19, 1942, at which time the union purported to act on his application for membership and deny the same. No further action was taken by the union as to Burns, and he never had a trial to determine what his rights, if any, were.

While it does not specifically appear from the findings, conclusions, or judgment upon what ground the trial court allowed plaintiffs Leo and Brown damages only to November 2, 1942, and Burns to October 19, 1942, we find in the memorandum opinion the following statement:

"That the defendant Union and its business agent, Mr. Palmatier, were the direct cause of the plaintiffs being severed from their employment by the Shipbuilding Corporation cannot be gainsaid. That their discharge was caused prematurely and before any hearing could be had, subjects the Union to liability for damages occasioned thereby but when the application of Mr. Burns was denied [Oct. 19, 1942] he thereafter had no further cause for complaint, as the Union had a perfect right to accept or reject the application of any individual, whether for cause or not. Therefore the plaintiff Burns has been damaged by reason of the loss of wages from October 7th to October 19th at the rate of $70.98 per week, amounting in all to the sum of $118.30. The plaintiff Leo is entitled to recover from October 12th

to November 2nd, a total of three weeks, amounting to the sum of $218.40. The plaintiff Brown is entitled to recover from October 6, 1942 to November 2, 1942, three weeks and four days, amount[ing] to the sum of $306.96."

Plaintiffs timely filed a motion for new trial, which was denied, and this appeal is by plaintiffs from the judgment entered.

As heretofore stated, while the judgment was against the union, in so far as damages were concerned, respondents did not cross-appeal, apparently being satisfied with the conclusions reached by the trial court that appellants were not entitled to maintain this action in so far as any claim for damages after November 2, 1942, the date of the purported trial of Leo and Brown, is concerned, and as to Burns after October 19, 1942, the day his application for membership was rejected, the court being of the opinion appellants were relegated to the procedure provided by the constitution and by-laws of the union to obtain any redress to which they may have been entitled by the action of the union.

Appellants state the court erred (1) in holding that the application of appellant Burns to become a member of respondent union was not accepted; (2) in holding that, in any event, this application was legally rejected; (3) in holding that the denial to class B members of the right to vote at the meeting of November 2, 1942, was lawful and not against public policy; (4) in holding that the failure of Brown and Leo to appeal to the International union precluded them from recovering damages accruing between November 2, 1942, and the date of trial; (5) in denying appellants' motion for new trial; (6) in refusing to enter judgment for appellants in the following amounts: Burns, $6,021.20, Brown, $4,647.20, Leo, $5,048.40; (7) in refusing to pass upon the following questions presented by the pleadings and the evidence: (a) whether the charges against appellants stated any grounds for expulsion even if true, (b) whether these charges were prepared, filed, and served in the manner required by respondent's constitution, (c) whether appellants Brown and Leo were given a fair trial, and (d) whether

there was any evidence offered at the trial to support the charge, even if the charge be deemed sufficient.

Before discussing appellants' assignments of error, we think it necessary to give some of the background which gave rise to this litigation. Unless otherwise stated, the facts as set out herein will be in substance as found by the trial court, such facts being undisputed.

Local Union No. 612 is a local union of the International Union of Operating Engineers. Respondent union operated under and by virtue of a charter granted by the International under the constitution of the International, which constitution controls and binds all actions of respondent in so far as the terms of such constitution are applicable.

Respondents James Estep and Earl Palmatier were, at the time of filing the complaints, the president and business agent and financial secretary, respectively, of respondent union. At the time of the trial within the union (November 2, 1942), William E. Westwood was president of respondent union.

During all of the times herein mentioned, Seattle-Tacoma Shipbuilding Corporation, whose name was changed to Todd-Pacific Shipyards, Inc., maintained and operated a shipyard in Tacoma, Washington, which yard was used exclusively for the manufacture of ships for the Maritime Commission of the United States, the United States navy, and Great Britain, including freighters and war vessels. This shipyard was enlarged to cover an area of several hundred acres, and facilities were installed to permit the simultaneous construction of a large number of ships. The construction of these ships required the movement by railway transportation into the shipyards of large quantities of materials. To facilitate this movement, railroad tracks were constructed throughout the yard, over which there was a continuous movement of railway freight cars which were loaded with materials required to be secured in order to construct such vessels.

To prevent the accrual of demurrage charges upon these freight cars and to facilitate their movement, it became necessary for the corporation to secure the services of per-

sons trained in the business of railroad transportation, particularly of persons accustomed to the switching and movement of freight cars.

Previous to the employment of appellants by the corporation, and on or about April 23, 1941, the Seattle-Tacoma Shipbuilding Corporation, together with a number of other shipyards located at Seattle, Portland, San Francisco, and Tacoma, as employers, executed a so-called master agreement with the Metal Trades Department of the A. F. of L., numerous international unions, and councils of labor unions located at those ports, which agreement provided, among other things, that employees be members of appropriate labor unions. It was originally agreed between the unions representing the various crafts employed in the yard and the shipbuilding corporation that all employees engaged in transportation in the yard should be members of the local union in Tacoma of International Brotherhood of Boilermakers, Iron Shipbuilders & Helpers of America. On or about April 13, 1942, by agreement of the parties to the master agreement, the respondent union was given jurisdiction over all employees engaged in the business of transportation.

Appellant Leo secured a position as switchman at the Seattle-Tacoma yard in November, 1941. Prior to that date, Leo had, for a portion of his active life, followed various occupations connected with the operation of railroads, including that of dispatcher, and had been for some years a member of the Brotherhood of Railway Trainmen, a labor union covering certain persons engaged in railroad operations, *"but which union, however, did not nor did it ever claim jurisdiction over any operation at the Seattle-Tacoma Shipyards."* At the time Leo went to work, an organization known as the Boilermakers Union had jurisdiction over transportation, and Leo was required to pay an initiation fee and dues into the Boilermakers Union as a condition precedent to his employment as a switchman. After jurisdiction was transferred to respondent union, Leo was required to make application to join respondent union, which he did, paying therefor an initiation fee of $120, and was

thereupon admitted to full membership in respondent union. In April, 1942, Leo was promoted to general yardmaster, for which position he received $72.80 per week of forty-eight hours, plus time and a half for overtime. Leo continued in this position and paid all dues required of him until he was expelled on November 2, 1942.

Appellant Brown entered the employ of the Seattle-Tacoma shipyards in May, 1942, in the capacity of assistant yardmaster on the night shift. In order to qualify for such employment, Brown was required, under the master agreement, to join respondent union, which he did after paying the union an initiation fee of $60, plus regular dues of three dollars per month. Brown continued in this employment at a weekly compensation of $83.72, plus time and a half for overtime, and continued to pay all sums due respondent union, until he was discharged under circumstances hereinafter set out. Brown was also a member of the Brotherhood of Railway Trainmen.

Appellant Burns, immediately prior to his employment in the Seattle-Tacoma shipyards, had been employed as a switchman by the S. P. & S. railroad, running between Spokane and Portland. In the latter part of June, 1942, Burns, at the solicitation of Leo, then general roadmaster in the yard, left his employment with the railroad and entered the employ of the shipyard, in the capacity of engine foreman. Burns was required to join respondent union before he could obtain employment in the yard. He made written application to join respondent union, in accordance with its rules and regulations, and offered to pay the full initiation fee of sixty dollars. However, an officer of the union suggested that he pay the initiation fee in installments, and accordingly, between the time of his application and October 6, 1942, he paid the union the sum of forty dollars, but he was ready and willing at all times to pay the full initiation fee. During the time Burns was employed, he was not required to pay dues, but he was given a button of a kind and character furnished to members of respondent union employed in the yard. Burns continued to perform his duties as engine foreman from the date of his employment

up to October 6, 1942, when he was discharged from his employment. Burns received as compensation the sum of $70.98 per week, plus time and a half for overtime.

It may be stated here that no question is raised as to the qualifications of any of these men to do the work they were employed to do and did do.

Prior to October 5, 1942, and on or about September 7th, a rumor had been circulated in the yard among the members of respondent union that the Brotherhood of Railway Trainmen intended to seek jurisdiction over transportation in the yard. The schedule of pay for persons engaged in the operation of railroads in capacity similar to those in the yard was substantially less than paid to the members of respondent union in the business of transportation in the yard, and the taking of jurisdiction by the Brotherhood of Railway Trainmen, should the same scale of pay have been applied as obtained upon the railroads, would have resulted in a substantial decrease in pay of many of the members of respondent union engaged in transportation. The trial court, however, specifically found that the Brotherhood at no time intended or desired jurisdiction over this operation, for the reason that the Brotherhood does not operate under a closed shop contract and does not care for jurisdiction over an operation deemed to be temporary. The testimony of L. A. Borden conclusively bears out the above finding, and also shows that the officers of the union were so informed prior to October 19, 1942.

Rumors and charges had been made among the members that appellants and each of them were engaged in a conspiracy to further the alleged taking over of jurisdiction by the Brotherhood, which charges were orally made at a meeting of the executive committee of respondent union held on September 7, 1942, at which meeting a number of the members of the union appeared and made statements concerning these matters. Appellants were not present at this meeting. Under the by-laws of respondent union, a regular meeting of the union was required to be held on the evening of October 5, 1942. Previous to the beginning of such meeting, there was held in the same building a meeting of the

executive board, which convened at seven p. m. and adjourned at 8:15 p. m., to reconvene again. During the first session, a letter was drafted in longhand and the office girl was instructed by the president to type a separate identical copy addressed to each of the appellants, which was done prior to 8:15 p. m. At that time, the executive board adjourned and attended the general meeting, where the president read that portion of the letter which set forth the charges, announced the names of the appellants, and said they would be required to plead to the charges October 19, 1942, stating that letters had been prepared and would be sent to the separate appellants. Thereafter, the executive board reconvened and disposed of its other business.

These letters were introduced as appellants' exhibits Nos. 1, 16, and 30. Exhibit No. 1, the letter to appellant Brown, reads:

"Mr. Fred E. Brown                          October 5, 1942
"Register No. 362006
"Dear Sir and Brother:
    "You are hereby cited to appear before Local No. 612, International Union of Operating Engineers, at its next regular meeting, on Monday, October 19, 1942, at 9:00 P. M., to answer charges filed against you by the Executive Board of said Local.
    "You are charged with violation of Section E of Subdivision Seven of Article Twenty Three of the International Constitution. In that you have, on several occasions, solicited membership for the Brotherhood of Trainmen from among the members of Local No. 612 while engaged on construction work coming under the jurisdiction of this Local. And otherwise causing dissension among said members of Local No. 612.
    "You will be given an opportunity on this date to plead 'Guilty' or 'Not Guilty' to above charges.
                          "Fraternally yours,
           "[Signed]   W. E. Westwood, President
                        "Ralph Benefield, Recording Sec."

The letter to Leo (exhibit No. 16) was the same as that sent to Brown. The letter to Burns was the same as that sent to Brown, with the exception it was headed "Dear Sir" instead of "Dear Sir and Brother."

The charge portions of these letters were read to Brown and Burns on October 19, 1942, to which they pleaded not guilty, and to Brown and Leo on November 2, 1942, to which pleas of not guilty were entered. Leo did not attend the meeting of October 19th, but, by letter, he entered a plea of not guilty.

At the meeting of October 5, 1942, Earl Palmatier, as business agent of respondent union, was by oral vote directed to notify the representatives of the Seattle-Tacoma Shipbuilding Corporation that appellants were no longer members in good standing and to demand their dismissal from their positions.

On October 6, 1942, Earl Palmatier, as financial secretary and business agent of Local No. 612, wrote and mailed to George Marsh, chief dispatcher at the shipyard and appellants' immediate superior, the following letter:

"At our regular meeting of October 5, 1942, the writer was instructed to notify you that there were charges preferred against the following members of Engineers Local No. 612, who are switchmen in the yard, namely, Howard Leo, John B. Burns and Fred E. Brown, and that it will be necessary of this date, October 6, 1942, to relieve them of their duties until they are cleared of charges preferred against them."

The above letter is appellants' exhibit No. 9.

On October 7, 1942, Earl Palmatier, as business agent, pursuant to the direction of the union at its meeting of October 5th, wrote and mailed to one Herzog, personnel manager of the yard, the following letter:

"I have been instructed by the Engineers Local Union No. 612 to inform you that Howard Leo, Fred E. Brown and John B. Burns are no longer members in good standing in our Engineers Local No. 612; and therefore request that they be discharged from their jobs."

In compliance with the demand made upon it by the letter of October 7, 1942, above referred to, and for no other reason, appellants and each of them were discharged from their employment on October 7, 1942, which discharge continued in full force and effect from that date to the trial of this action.

No formal charges other than those contained in exhibits Nos. 1, 16, and 30, the letters sent to appellants, were ever made by any officer, committee, or member of the union.

At the meeting of October 19, 1942, respondent union rejected the application of Burns to become a member of the union. The vote upon his application was taken orally, and no written or ball ballot vote was taken. Class B members of respondent union were not permitted to vote thereon. After his application was rejected, no further notice of any proceedings was given to Burns, and he was afforded no trial before the union.

On October 23, 1942, the following letter, signed by Earl Palmatier, Fin. Sec. & Bus. Rep. Engineers Local No. 612, was sent to Brown and Leo:

"You are hereby cited to appear at the next regular meeting of the Operating Engineers Local No. 612, Monday evening, November 2nd, at 8 P. M., in Hall B of the Labor Temple, 15th & Market."

It will be noticed that the above letter did not inform Leo and Brown the purpose of the citation.

Brown and Leo appeared at the meeting of November 2nd, at which time they were informed *that they would be tried upon the charge that they had solicited members of the respondent union to become members of the Brotherhood of Railway Trainmen.* The International constitution, Art. 23, subd. 7, § 1, provides for trials by a local union, and gives to a person charged with violation of the rules and regulations of the union the right to select counsel from among the members, or he may present his own case.

The situation confronting Leo and Brown at this time is shown by the testimony of Mr. Brown, which is to the effect that, in view of the short time he had to prepare, he had no one to represent him, and he saw no one in the meeting who he thought was well enough advised to represent him, so he undertook to do the best he could for himself. There were some seventy-five members of respondent union present at the meeting, of whom a substantial number were class B members, that is to say, members who had the same status as Brown but who were not permitted to vote on the

question of the guilt or innocence of Leo or Brown. One Alvin A. Davidson, a member of the union, was appointed prosecutor, and, at the beginning of the proceedings and before any evidence was received, Davidson stated to the meeting that they had compiled so much damaging evidence against Brown and Leo that he would like to offer them a chance to change their pleas from not guilty to guilty.

Various witnesses were called by the union, and Leo and Brown testified in their own behalf. At the hearing in the superior court, Brown testified that he asked each witness called by the prosecutor:

" 'Did I ever solicit you as a member in the Brotherhood of Railway Trainmen?' And he said, 'No.' "

The findings do not show Brown's testimony, but it is reflected in the trial court's finding that

" . . . no witnesses testified that the plaintiff Fred E. Brown had ever solicited members of the defendant union to become members of the Brotherhood of Railway Trainmen."

The testimony does not show that Brown solicited members of the union to join the Brotherhood. All the testimony which was produced by the union was that several witnesses testified that Leo had solicited one George Hodges, a member of respondent union, to become a member of the Brotherhood.

At the conclusion of the testimony, a vote was taken on the guilt or innocence of appellants. Class B members were not permitted to vote. Upon the conclusion of the vote, the secretary declared that of the persons permitted to vote, thirty-five members had voted guilty and no member had voted not guilty as to Leo, and, in the case of Brown, twenty-eight members had voted guilty and six not guilty. Appellants were found guilty by a vote of more than three fourths of the class A members recorded as present at the meeting, but were not found guilty by a three-fourths vote of the members present including class B members. After the result of the vote had been announced, the president ordered that appellants Leo and Brown be expelled from the union.

Under § 1, "Trials," hereinbefore referred to, a three-fourths vote of the membership recorded as present shall be required for conviction in cases involving expulsion, and a majority vote in cases involving other penalties. If a verdict of guilty is returned, the president shall prescribe the penalty permitted by the vote to be imposed.

It may be stated here that the International constitution provides that branch charters may be issued to local unions under which such local unions are permitted to organize, as a part of their membership, persons who shall have more restricted rights than members of the parent union. Pursuant to this provision in the International constitution, a branch engineer's charter was issued to respondent union, authorizing it to have a branch subdivision known as No. 612-B. Section 5, of Art. 14, of the International constitution, provides:

"Any Junior and Apprentice Engineers' Subdivision or *Branch Engineers' Subdivision* heretofore or hereafter created by the restricted or sub-charters referred to in this Article, shall function under the direction and control of the parent Local Union to which the same belongs. They shall be accountable to and function under their parent Local Union and they shall respond to, be under the control of and be governed by the said parent Local Union . . . Said members shall be without vote in their parent Local Union save and except upon such matters as the parent Local Union may consent to; provided, however, that they may not vote, even should such consent be granted, in any election of officers of the parent Local Union, nor shall they hold office in their parent Local Union, nor shall they elect officers in their subdivisions." (Italics ours.)

In about 1941, the International instructed respondent union that No. 612-B members could vote only on such subjects as No. 612 gave consent to, and that at trials of No. 612 members, No. 612-B members could not vote, but at trials of No. 612-B members, members of No. 612-B could vote by consent.

While it is apparent from the above statement that at the meeting of November 2, 1942, the class B members could have voted, at least on the question of Brown's guilt or in-

nocence, with the consent of the members of No. 612, they were not permitted to do so.

Section (e) of subd. 7, Art. 23, of the International constitution, which under the charter of respondent union is controlling over respondent union, provides in part:

"Any officer or member of a Local Union who becomes an habitual drunkard; who wrongs a fellow member or defrauds him; who commits an offense discreditable to the International Union or its subdivisions; who creates dissension among the members; who destroys the interest and harmony of the Local Union; who seeks to dissolve any Local Union or separate it from the general organization; who wilfully slanders or libels an officer or member of the Organization; who violates the trade rules of the locality in which he is working; who fraudulently receives, misapplies, converts or embezzles the funds of any subdivision of the International Union or the monies of any member entrusted to him; who violates the obligation or any section of the Constitution, Rules, Edicts and Ritual of the International Union; who divulges the password to anyone except the officer authorized to receive the same; who is guilty of insubordination; or who refuses to acknowledge or perform the lawful command of those authorized within the International Union to issue the same, may be disciplined or, upon trial therefor and conviction thereof, be fined, suspended or expelled from his Local Union."

Section 1 of subd. 7 provides in part:

"A Local Union shall have the power to discipline, fine, suspend or expel its members, upon causes provided in this Article, and provided further that any member charged with the offenses designated in this Article shall be tried within the jurisdiction of the Local Union where said offense was committed, in which case a copy of the verdict shall be sent to the Local Union to which the member charged belongs.

"*All charges must be preferred in writing,* signed by the complainant and filed with the Recording-Corresponding Secretary and read by the Recording-Corresponding Secretary at the next succeeding meeting following the filing of same. Immediately upon filing of such charges the Recording-Corresponding Secretary shall notify the defendant in writing, enclosing a copy of said charges, and of the date set for the filing of the answer or defense or the entering of a

plea by the defendant, which date shall be not less than two nor more than four weeks thereafter." (Italics ours.)

We are of the opinion the above constitutional provision relative to the signing and filing of a complaint with the recording secretary was not complied with.

It will be remembered that, at a meeting of the executive board held on September 7, 1942, a number of the members of respondent union appeared before the committee and made statements concerning the claimed activities of appellants, but no formal charges of any kind were filed. It will be further remembered that, at a meeting of the executive board held on October 5th, prior to the general meeting, a letter was drafted in longhand and the office girl was instructed by the president to type a separate identical copy addressed to each of appellants (exhibits Nos. 1, 16, and 30, the letters hereinbefore set out, sent to each appellant). At the meeting which followed the session of the executive committee, the president read the portion of the letters which set forth the charge, and stated that letters had been prepared and would be sent to the separate appellants. This general meeting took place sometime after 8:15 p. m. on October 5th, and appellants were notified to appear and plead on October 19th.

We are firmly of the opinion that respondent union failed to follow the procedure outlined by the constitution, in that no charges were ever preferred in writing against appellants, signed by the complainant, and filed with the recording secretary.

We next desire to take up the charge as contained in the letters sent to appellants. In the first place, all three of the letters assumed that all the appellants had the same status, and that, because they were charged with soliciting membership in the Brotherhood of Railway Trainmen, they had committed an act because of which they were not in good standing in the union. The letters charge each of the appellants with a violation of § e, subd. 7, of Art. 23, hereinbefore set out,

"In that you have, on several occasions, solicited membership for the Brotherhood of Trainmen from among the mem-

bers of Local No. 612 while engaged on construction work coming under the jurisdiction of this Local. And otherwise causing dissension among said members of Local No. 612."

█ We are of the opinion we should disregard the last part of the purported charge, that is, the statement "and otherwise causing dissension among said members of Local No. 612," as the only attempted showing made to support the above charge was that Leo and Brown had solicited membership for the Brotherhood. The court found, and the evidence sustains the finding, that Brown did not solicit a member of respondent union to join the Brotherhood.

But assuming, for the sake of argument, that both Leo and Brown did solicit members of respondent union to join the Brotherhood, still we are of the opinion such solicitation, under the constitution and by-laws of the union, furnished no ground for expelling these two men. The trial court found, and we are of the opinion a reading of the constitution entirely bears out the finding, that there was no provision in either the constitution of the International Union or the by-laws of respondent union which prohibited members of respondent union from being members of other craft unions, and that a substantial portion of the members of respondent union employed at the shipyards were, during the period referred to by the evidence, members of other craft unions. There is certainly nothing in the constitution or by-laws that makes the solicitation of members in respondent union for membership in another union cause for expulsion or fine or disciplinary measures. In other words, it is our opinion that the charge made against appellants, assuming that they did solicit membership for the Brotherhood, constituted no ground for the expulsion of appellants, or any of them, based thereon, and we are further of the opinion that, the charge being wholly insufficient to warrant the expulsion of appellants, the whole proceeding was a nullity, and appellants were not required to follow the procedure provided by the constitution and by-laws for taking an appeal from the action of the union, but were entitled to pursue the remedy here sought in the courts.

We desire to first call attention to the case of *Local Union No. 57 v. Boyd,* 245 Ala. 227, 16 So. (2d) 705. The opinion states:

"Of course, it is well understood that courts are indisposed to interfere with the internal management of an unincorporated, voluntary association as is here involved. [We are assuming that respondent is such a union, in spite of the fact that the employees in the shipyard were compelled to join the union if they desired to work.] We have held that the right of a voluntary association to interpret and administer its own rules and regulations is as sacred as the right to make them, and there is no presumption against just and correct action or conduct on the part of its supervising or appellate authorities and tribunals. However, in line with the current of authority elsewhere, this court has held that such associations must act in good faith, and not violate the laws of the land or any inalienable right of their members. The constitution, laws, and regulations of such associations are in the nature of a contract between it and its members, and they, as well as the association, are bound thereby; and the expulsion of a member, if for cause *within the jurisdiction of the tribunal* of the association by which it is pronounced, after notice and opportunity to be heard and a trial conducted in accordance with the constitution, laws, and regulations of the association, is conclusive upon the civil courts." (Italics ours.)

We next desire to call attention to a case decided by this court, to wit, *Ray v. Brotherhood of Railroad Trainmen,* 182 Wash. 39, 44 P. (2d) 787. In the cited case, Frank Ray belonged to the Brotherhood of Railroad Trainmen. Pursuant to an order of the United States railroad labor board, the trainmen took a vote to determine whether they desired the Brotherhood, which at that time had the contract, or the Switchmen's Union, thereby aiding the Switchmen's yardmen in dealing with the employer. Ray, being a member in good standing of the Brotherhood, voted in favor of the Switchmen's Union, thereby aiding the Switchmen's Union in its effort to take from the Brotherhood the contract for representation of the yardmen. Based upon his vote in favor of the Switchmen's Union, Ray was charged with an offense against the Brotherhood. We quote from the opinion:

"As to appellant's contention that this action is barred because Mr. Ray did not seek to protect his rights by appealing within the order from the judgment of expulsion, we hold that the order of expulsion entered after certain proceedings had by the local lodge was absolutely void as based upon a purported charge which, considered both by itself and in the light of the evidence in the case, stated no offense whatsoever against the Brotherhood, and which, considered in the light of a charge that Mr. Ray was subject to discipline by the lodge, amounted to no more than a meaningless form of words which conferred upon the Brotherhood no jurisdiction whatsoever to attempt to subject him to any disciplinary measures."

The opinion cites with approval and quotes from *Rueb v. Rehder,* 24 N. M. 534, 174 Pac. 992, 1 A. L. R. 423, as follows:

" 'The question logically follows as to whether or not a member is required to appeal from a void order of expulsion before resorting to the courts for relief.

" 'While there is some conflict among the authorities upon this question, we believe that the weight of authority is to the effect that if the action of the lodge is without jurisdiction, or without notice or authority, it does not change the legal rights or status of any one; that the obligation to appeal within the order is not imposed when the judgment is void for want of jurisdiction. . . .

" 'The constitution and by-laws of such an association constitute the contract between the member and the association, and govern and limit the rights and liabilities of the member and the association. So long as such an association is acting under such rules and regulations, and in accordance therewith, the member must likewise act, as he is required to do, under such a contract or rules and regulations. When, however, the association departs from the letter and spirit of the contract, and does an act which it is not authorized to do under the contract, it would be without reason to say that the member was required to conform to the rules in order to secure relief from such unauthorized action. The contract, which is the constitution, rules and regulations, operates alike on both the association and the member. He agrees that it shall have the right, for certain infraction of its rules, to expel him from his membership, in a certain prescribed manner; that, if it votes to expel him in that manner, he will not resort to the courts for relief until after he has exhausted his remedies in the order; that he will first appeal to the Grand Chief Engineer, and from his decision, if ad-

verse, to the Grand International Division Convention. But he has not contracted that he will appeal from some decision rendered by the association, where he did not contract that it should have the power or authority to render such a decision.' "

The opinion in the *Ray* case continues:

"This doctrine is recognized in the case of *Webster v. Rankins,* 50 S. W. (2d) (Mo. App.) 746, and *Johnson v. International of United Brotherhood etc.,* 52 Nev. 400, 288 Pac. 170. In the case last cited, the supreme court of Nevada quoted with approval from Bacon, etc., as follows:

" 'It is said in Bacon, Benefit Societies (3d ed.), sec. 107, that: ". . . It is, however, well settled that: 'If the action of the lodge be a usurpation, or without notice or authority, it cannot affect the legal rights or change the legal status of any one. The obligation to appeal is not imposed when the judgment is void for want of jurisdiction. It may be likened to a judgment rendered by a court which has no jurisdiction of the subject-matter or of the person. No appeal or writ of error is necessary to get rid of such a judgment. It is void in all courts and places, and the duty of an expelled member to exhaust, by appeals or otherwise, all the remedies within the organization arises only where the association is acting strictly within the scope of its powers.' "

" 'Such is the law as recognized by all authorities in England and by a great weight of authority in the United States. Sustaining the view stated, we mention some of the authorities. [Citing many cases, including *State ex rel. Cicoria v. Corgiat,* 50 Wash. 95, 96 Pac. 689.]' "

The *Johnson* case referred to in the foregoing quotation also states that, to constitute an offense, the charge must specifically state that the person charged is guilty of some act or acts prohibited by some law of the organization.

In the instant case, appellants were charged with soliciting membership in the Brotherhood among the members of respondent union. That is the purported charge which was read to appellants, and the charge which respondent union attempted to sustain. As hereinbefore stated, neither the constitution nor by-laws provide that such act shall constitute ground for disciplinary action by the union or ground for expelling a member.

See, also, the case of *Mulroy v. Supreme Lodge of Knights of Honor,* 28 Mo. App. 463, cited with approval in the *Ray* case, *supra.*

We desire also to call attention to a late California case, *Smetherham v. Laundry Workers Union,* 44 Cal. App. (2d) 131, 111 P. (2d) 948. We quote from the opinion:

"In determining that the petitioner was wrongfully expelled as a member of the organization, that she is entitled to be reinstated and that she is entitled to recover judgment for the amount of wages which she lost on that account, Honorable Dal M. Lemmon the learned judge of the trial court, rendered a well-considered opinion which we adopt in part as the decision of this court, as follows:

" 'No member can be expelled and thus deprived of his interest in the property of the association, except for violation of some provision of the law of the association creating the offense charged and prescribing expulsion as a penalty, or, in the absence of such provision, for offenses of an infamous character indictable at common law, or for offenses against the member's duty to the organization. (4 Am. Jur. 469.) The offense here was not of the infamous character indictable at common law, named in the rule. Nor can it be maintained that it was against the member's duty to the organization. The most that can be said is that the offense was against an individual member rather than against the association.

" 'If the expulsion is to be sustained it must therefore find basis in the laws of the association. A member may be expelled for violation of a law of the association which provides for expulsion. (7 C. J. S. 60.)' "

We again call attention to a finding made by the trial court in the instant case:

"Pursuant to said letter said plaintiffs [Leo and Brown] appeared at a meeting of the defendant union on November 2, 1942, at which time they were informed that *they would be tried upon the charge that they had solicited members of the defendant union to become members of the Brotherhood of Railway Trainmen.*" (Italics ours.)

We are satisfied, for the reasons herein stated, based upon the record in this case and the authorities cited, that the purported judgment of the union, expelling Leo and Brown from membership in respondent union, was abso-

lutely void; that being true, they were entitled to maintain this action and were entitled to recover damages not only up to the date of the purported expulsion, but up to November 1, 1944. There being no dispute as to the amount Leo and Brown would have earned had they not been unlawfully expelled, we are further of the opinion appellant Leo is entitled to judgment against respondent union in the sum of $5,048.48, and appellant Brown in the sum of $4,647.20. These sums represent the difference between what the court found Leo and Brown would have earned had they continued in employment up to November 1, 1944, and what the court found they had earned in other employment.

We will now return to the case of appellant Burns. It will be remembered that Burns made application to join the union in June, 1942. He paid into the union the sum of forty dollars on his initiation fee of sixty dollars, and was ready and willing at all times to pay the balance. He went to work the next day after his application was made, notwithstanding that, under respondent union's agreement, all employees engaged in the work done by Burns and the other appellants must be members of the union. Burns was given a button by the union, the same as other member employees wore. He continued in this employment up to October 6, 1942, when he received the letter hereinbefore referred to.

In the above letter, and in the letter of October 6, 1942, written by Earl Palmatier, as financial secretary and business agent of respondent union, to George Marsh, and in the letter written by Earl Palmatier, as business agent, pursuant to the direction of the union, to one Herzog, personnel manager of the yard, Burns was referred to as a member of Local No. 612. He was undoubtedly believed to be a member of the union by the other members, and the above letters indicate he was so considered by the officers of respondent union. Burns was required to appear and answer the purported charges contained in the letter of October 5th, because it was believed he had the status of at least a *de facto* member of the union. He was not notified to the contrary when he appeared on October 19th and

entered a plea of not guilty to those charges. It was apparently after Burns had left this meeting of October 19th, that it was discovered that no formal action had been taken upon his application for membership, so at that time an oral vote was taken, and his application was rejected. Burns was given no further notice of a hearing on the purported charges and was never accorded a trial or hearing of any kind by the union.

Subdivision 6 of Art. 23 of the constitution provides:

"Application for membership shall be referred to a committee, which may consist of the Local Executive Board in the Local Union, which committee shall investigate the character and qualifications of the applicants and report not later than the next meeting. A written or ball-ballot vote shall be taken. A majority of the ballots cast shall be required to elect an applicant."

It does not appear that Burns' application was ever referred to a committee, and it is admitted that no written or ball ballot vote was ever taken upon his application for membership.

■ We are of the opinion that Burns' application for membership was never legally rejected; that his right to continue in employment and his status in the union was in no way affected by this attempted rejection. We are further of the opinion that Burns' status in the union, as recognized by both the officers and members of the union, was such as entitled him to a hearing on the purported charges, which hearing, as stated, was never accorded to him; but, assuming that Burns never actually acquired the status of a *de facto* member of the union, nevertheless, it appearing that he had been unlawfully discharged from his employment, which discharge was entirely due to the demand made by respondents upon the employer, and which demand the employer, under his contract with the respondent union, was bound to recognize, we are of the opinion that Burns would not be relegated to the procedure provided by the constitution and by-laws of the union, but would be entitled to bring this action to recover the damages sustained because of such unlawful discharge.

The trial court specifically found in the case of Burns, as in the cases of Leo and Brown, that he had been unlawfully discharged from his employment, which discharge was due entirely to respondent union and its officers; that, if Burns had continued in his employment, he would have earned a certain sum. The trial court further found that each of the appellants had made diligent effort to find other employment, and the amount each of them had earned in such employment during the period here involved. No exception to these findings was taken by respondents.

We therefore conclude as to appellant Burns that, under either of the theories above stated, he was entitled to maintain this action, and that he is entitled to judgment against respondents because of their unlawful acts, not only to October 19, 1942, as found by the trial court, but up to November 1, 1944, in the sum of $6,021.20, being the difference between the amount the court found Burns would have earned between October 7, 1942, and November 1, 1944, had he remained in his employment, and the sum he earned in other employment during the period involved.

For the reasons herein assigned, the judgment of the trial court must be, and it is, reversed, in so far as it holds that appellants Leo and Brown were entitled to damages only up to November 2, 1942, the date of the purported trial, and appellant Burns up to October 19, 1942; and the cause is remanded to the superior court with instructions to enter judgment for each of these appellants in accordance with this opinion.

Appellants will recover costs herein.

MILLARD, C. J., STEINERT, ROBINSON, SIMPSON, and MALLERY, JJ., concur.

CONNELLY, J. (dissenting)—The plaintiffs, Howard A. Leo, Fred E. Brown, and J. B. Burns, each brought a separate action against Local Union No. 612 of International Union of Operating Engineers, a voluntary association, James Estep, as its president, and Earl Palmatier, as its business agent and financial secretary, as defendants, to recover for damages alleged to have been sustained as a result

of their discharge from their respective jobs in the Seattle-Tacoma shipyard. It was alleged by plaintiffs Leo and Brown that their discharge was effected by their wrongful expulsion from the defendant union, and by plaintiff Burns by the refusal of membership in the union after he had worked during a temporary period on a work permit.

The Seattle-Tacoma shipyard was a war industry engaged in the construction of ships, under contract with the United States government, and operated on the closed-shop basis. All of its bargaining agents were affiliates of the American Federation of Labor. One of the types of industry necessary to the operation of the shipyard was a railroad, which was physically confined to the yard itself. The workmen engaged in the operation of this railroad were under the jurisdiction of the defendant union. Plaintiffs were employed in this railroad service. Leo and Brown were members of the defendant union, and Burns had made application for membership at the time his employment in the shipyard commenced.

The separate causes of action of the three plaintiffs were consolidated for trial. Two principal issues were presented for determination: (1) Were plaintiffs Leo and Brown wrongfully expelled from the defendant union and was plaintiff Burns wrongfully denied membership in the union; and (2) did the plaintiffs pursue all of the remedies for redress afforded to them by the constitution and by-laws of the International Union of Operating Engineers, from which Local Union No. 612 derived its rights and powers?

The trial judge held that the plaintiffs' suits could not be maintained, predicating his ruling upon the failure of the plaintiffs to exhaust all of the remedies afforded them by the constitution and by-laws of the International Union. He likewise held, in effect, that the plaintiffs Leo and Brown had been wrongfully expelled from the defendant union, and that plaintiff Burns had been wrongfully denied membership in the union. The trial court's rulings were resolved to a judgment denying them any relief whatsoever. They have appealed.

All of the appellants had been members of the Brotherhood of Railroad Trainmen. As indicated, Leo and Brown assumed membership in the respondent union prior to the time the events leading up to the issues in the instant case occurred. Burns had applied for membership in the respondent union in the latter part of June, 1942, and went to work in the Seattle-Tacoma shipyard in July, 1942, on a temporary permit pending action upon his application for membership in respondent union. No action had been taken upon Burns' application up to and including October 5, 1942, when each of the appellants received identical letters from the secretary of Local No. 612 and bearing the signature of its president. The letters read as follows:

"You are hereby cited to appear before Local No. 612, International Union of Operating Engineers, at its next regular meeting, on Monday, October 19, 1942, at 9:00 P. M., to answer charges filed against you by the Executive Board of said Local.

"You are charged with violation of Section E of Subdivision Seven of Article Twenty Three of the International Constitution. In that you have, on several occasions, solicited membership for the Brotherhood of Trainmen from among the members of Local No. 612 while engaged on construction work coming under the jurisdiction of this Local. And otherwise causing dissension among said members of Local No. 612.

"You will be given an opportunity on this date to plead 'Guilty' or 'Not Guilty' to above charges."

Immediately following the mailing of these letters and on October 7, 1942, the financial secretary and business representative of Local Union No. 612 notified the proper officials of the Seattle-Tacoma shipyard that the appellants were no longer members in good standing of Local Union No. 612 and requested that they be discharged. The employer, having no alternative under his closed-shop contract, complied with the request.

Appellant Leo replied to the letter of October 5th, in writing, denying the charges set forth against him and entering a plea of not guilty. Appellants Brown and Burns appeared at the meeting of October 19th, at which time they

denied the charges and pleaded not guilty. In that meeting, however, Burns' application for membership in respondent union was formally rejected. On October 23, 1942, respondent union notified appellants Leo and Brown to appear at the next regular meeting of the Operating Engineers Local Union No. 612, on Monday evening, November 2nd, at eight p. m., in Hall B of the Labor Temple, 15th and Market, Tacoma.

In the meantime, appellants had consulted by long distance telephone with A. F. Whitney, president of the Grand Lodge of the Brotherhood of Railroad Trainmen at Cleveland, Ohio. Under date of October 13th, Whitney wired L. A. Borden, chairman of the Brotherhood of Railroad Trainmen on the Chicago, Milwaukee, St. Paul & Pacific Railroad Company at Tacoma, as follows:

"Advised several of our members discharged by Seattle-Tacoma Shipbuilding Corporation account protest by members of another union. Please meet management at once and endeavor to have matter straightened out and our men returned to work. In event management declines to cooperate, employ an attorney and undertake to have men restored to their former positions with pay."

Borden attempted to intercede, but was unsuccessful. His effort confirmed the suspicion already in the minds of the officers and members of Local Union No. 612, that the Brotherhood of Railroad Trainmen, through its top-ranking officials, was endeavoring to acquire jurisdiction of such employees engaged in operating trains in the Seattle-Tacoma shipyard as were eligible to membership in the Brotherhood. In fact, Mr. Whitney's interest and that· of the Brotherhood of Railroad Trainmen lends strong confirmation to the several indications in the record that a surreptitious proselyting campaign was being carried on by the trainmen within the ranks of the respondent union.

On November 2nd, Leo and Brown appeared for trial in compliance with the citation issued to them on October 23rd. A hearing was had. No transcript of the testimony was preserved. However, from the record in this case, it appears that ample evidence was adduced to sustain the

charges. It is my observation and conclusion that the trial conducted by respondent union officials was done so with due regard to the rights secured appellants by the constitution and by-laws of the International Union. At the hearing, the appellants emphatically denied having solicited members for the Brotherhood of Railroad Trainmen. However, their conduct leads to a different conclusion. Burns admitted that he had distributed Brotherhood of Railroad Trainmen application cards to employees in the shipyard. In fact, several such applications were submitted to the Tacoma Local of the Brotherhood of Railroad Trainmen, with Burns' name appearing as the brother recommending the applicant. Other testimony leads to the same conclusion.

George N. Hodge, a member of Local No. 612, testified as follows:

"Q. Will you state what the conversation was that you had with Mr. Leo at that time and place? A. He asked me if I belonged to the Trainmen and I told him, 'No.' Q. And what did he say then? A. Well, he said he had an application or could get one for me to sign that would be to my benefit when I signed it. Q. What did you say then? A. Well, he handed me the application blank and I told him I would fill it out. . . . Q. Did Mr. Leo make any statement at the time he signed your card with respect to your future employment? A. Well, he said it would be to my advantage if I signed the application for the Trainmen. . . . Q. Did you have any conversation with the plaintiff Brown? A. I did. . . . Q. Where did the conversation take place? A. I believe it was just between shifts, between the morning shift and the swingshift. Q. Now, at that time and place will you state what the conversation was between you and Brown? A. Well, he asked me if I had signed the application blank yet and I told him 'No.' He asked me if I was intending to and I told him I thought I probably would. I told him later, within, I believe, it was the next day or so afterwards, that I had signed it and turned it in. . . .

"Q. Did you testify at the trial? A. I did. Q. Of November 2nd? A. Yes. Q. At the conclusion of your testimony did Leo or Brown ask you any questions? A. No, I don't believe they did. Q. Did you testify in their presence? A. I did."

Another member of Local No. 612, Walter C. Pearson, testified:

"Q. Did you have a conversation with Mr. Leo with respect to the Union affiliation of the switchmen in general? . . . A. Yes, I did. . . . Q. Will you tell us what the conversation was? A. Well, there was not much of a conversation to it, he just says that the switchmen should be under the Trainmen. . . . Q. Now, you stated that you had another conversation with him; . . . Q. And what was the conversation? A. Well, about all that was said was he said, 'It won't be long now before we will have the switchmen in our own hands, in our own Union.'"

Pearson testified to the same effect at the trial of November 2nd.

Steve Conant testified:

"Q. Will you state, as near as you can recall, what the conversation was between you and Mr. Brown? A. Well, Mr. Brown asked me if I belonged to the Railroad a number of years and that I must have belonged to the Trainmen, and I told him, 'Yes, I did, I belonged to the Trainmen for a number of years and Conductors both, I double-headed.' And so he says, 'Well, it is nice to double-head, they have a very nice lodge here, social activities and things like that connected with the Trainmen here; it is nice to join them and be in them,' and he told me that I could get an application blank if I wanted it from Mr. Burns, or he thought Mr. Burns had an application blank, or something like that."

While Conant did not testify at the meeting of November 2nd, he was a member of the executive board which preferred the charges against appellants.

George Doherty, another member of Local No. 612, testified:

"Q. What words were spoken in the presence of Mr. Leo either by Mr. Hodges or by Mr. Leo? A. He asked Mr. Hodges——Mr. Leo asked Mr. Hodges if he was going to join the Trainmen, and told him it would be better for him if he did; that he could get his application blank from Burns, or he would get it for him. . . . Q. Have you had any further conversation with Mr. Leo? A. I—the only conversations that I overheard Mr. Leo, I can't tell you the names of the gentlemen he was talking to, but he said it would be a Trainmen yard."

He testified substantially to the same effect at the trial of November 2nd.

The foregoing is only a sketchy resume and by no means all of the evidence of the activities of the appellants in seeking to proselyte members of the respondent union for the Brotherhood of Railroad Trainmen. The purpose, of course, was to give the Brotherhood of Railroad Trainmen jurisdiction of the employees in the shipyard eligible to membership in the Brotherhood. The record warrants this conclusion, and it is fortified by the intervention of Whitney before and after the trial of November 2nd. Even after the trial was completed, it was at Whitney's instance that the war production board intervened and, through a conciliator, attempted to reinstate appellants in the union and replace them on their jobs. It seems plain that the evidence was more than sufficient to justify the respondent union in expelling Leo and Brown from membership and rejecting Burns' application for membership.

It is asserted by appellants that certain requirements of the constitution and by-laws of the International Union of Operating Engineers were not observed in the procedure of preferring charges against the appellants, bringing about their discharge, and expelling two of them and denying a third membership in the local union. The constitution of the International parent union provides:

"No suit or other action at law or equity shall be brought in any court by any member, officer or subdivision of the International Union of Operating Engineers until and unless all rights, remedies and provisions for hearing, trial and appeal within the Organization shall have been properly followed and exhausted by the member, officer or subdivision complaining."

It is a fundamental rule, universally recognized by judicial decision of this country, both state and Federal, that courts will not take jurisdiction of controversies involving *discipline* of members of a voluntary association in the face of such a provision of its constitution or by-laws, *until all remedies afforded thereunder have been exhausted. Dragwa v. Federal Labor Union No. 23070,* 136 N. J. Eq. 172, 41 A.

(2d) 32; *Lundine v. McKinney*, 183 S. W. (2d) (Tex. Civ. App.) 265; *Reno Lodge No. 99, I. O. O. F. v. Grand Lodge, I. O. O. F.*, 54 Kan. 73, 37 Pac. 1003, 26 L. R. A. 98; *Howard v. Betts*, 190 Ga. 530, 9 S. E. (2d) 742; *Gill v. Grand Lodge Brotherhood of R. Trainmen*, 272 Ky. 328, 114 S. W. (2d) 123; *State of North Dakota v. North Central Ass'n, etc.*, 23 F. Supp. 694 (affirmed 99 F. (2d) 697); *Textile Workers Union, etc. v. Federal Labor Union, etc.*, 240 Ala. 239, 198 So. 606, 131 A. L. R. 896.

4 Am. Jur. 466, § 17, under the general title "Associations and Clubs," states:

"It is well established that courts will not interfere with the internal affairs of voluntary associations, except in such cases as fraud or lack of jurisdiction."

Again, in § 19, at p. 467, it is stated:

"It is competent for an association and its members to agree that questions between them and the order shall be referred to, and settled by, tribunals established within the order; its by-laws may provide that a member shall not appeal to the courts to redress alleged wrongs without first appealing to the tribunals of the association, in which case the member must exhaust all the remedies so provided before he may appeal to the courts, unless these by-laws are unreasonable, or the proceedings are not conducted in accordance with the rules, but contrary to law and justice."

And, again, in § 31, p. 475, it is stated:

"It is well settled that the courts will not interfere, at the instance of an aggrieved member of an association, to reinstate him or enjoin his expulsion, until he has exhausted all the remedies afforded him by the constitution or by-laws of the association, or shows a good excuse for not having done so."

See *Samuelson v. Brotherhood of R. Trainmen*, 151 P. (2d) (Wyo.) 347, *Gleason v. Thomas*, 121 W. Va. 619, 5 S. E. (2d) 791.

7 C. J. S. 81, § 34, states:

"Even in cases otherwise warranting judicial interference the courts will not, as a rule, take jurisdiction unless the complaining member has exhausted such remedies as may be provided by the laws of the association itself."

In support of this rule, the editors of C. J. S. cite *Harris v. Missouri Pac. R. Co.* (D. C. Ill.), 1 F. Supp. 946; *Hughes v. American Trust Co.*, 134 Cal. App. 485, 25 P. (2d) 491; *Greenwood v. Building Trades Council of Sacramento,* 71 Cal. App. 159, 233 Pac. 823; *Aulich v. Craigmyle*, 248 Ky. 676, 59 S. W. (2d) 560; *Elfer v. Marine Engineers Beneficial Ass'n, No. 12,* 179 La. 383, 154 So. 32; *Mulcahy v. Huddell,* 272 Mass. 539, 172 N. E. 796; *Malloy v. Carroll,* 272 Mass. 524, 172 N. E. 790; *Agrippino v. Perrotti,* 270 Mass. 55, 169 N. E. 793; *Ryan v. New York Cent. R. Co.,* 267 Mich. 202, 255 N. W. 365; *Crisler v. Crum,* 115 Neb. 375, 213 N. W. 366; *Polin v. Kaplan,* 231 App. Div. 849, 246 N. Y. Supp. 522; *Bertucci v. United Cement Masons' Union No. 1,* 139 Misc. 703, 249 N. Y. Supp. 635.

The rule laid down in all of the foregoing authorities is not novel to this court. In *Herman v. Plummer,* 20 Wash. 363, 55 Pac. 315, which was filed in 1898, a dispute between members of a voluntary association and the association itself was summarily instituted in court, without resort to the means of redress within the organization which had been adopted in the by-laws of the national society. They provided:

" 'The executive committee shall be the court of final appeal in disputed questions arising between members *of, in and between branches.*' "

In reaching its determination, this court said:

"It is not pretended that any effort was made by the plaintiffs to have the questions involved in the present dispute determined by the committee mentioned in that section, and it is a well established principle, applicable to controversies like the present, that until the members have exhausted their remedy within the society the courts will not assume jurisdiction of the controversy. *Oliver v. Hopkins,* 144 Mass. 175 (10 N. E. 776); *Lafond v. Deems,* 81 N. Y. 507; *Chamberlain v. Lincoln,* 129 Mass. 70; *Watson v. Jones,* 13 Wall. 679."

More recently, in *Local Lodge No. 104 of International Brotherhood of Boiler Makers v. International Brotherhood of Boiler Makers,* 158 Wash. 480, 291 Pac. 328, this court said:

"It is also true that the rule which requires members of voluntary associations to exhaust their remedies within the order before applying to the courts for relief, applies primarily to controversies concerning matters of internal discipline, *and not to disputes over money or tangible property,* and that, in the latter class of cases, the right to resort to the courts should be held to be waived only by an express agreement to submit such controversies to some specified method of arbitration." (Italics mine.)

Appellants contend that their cases fall within the latter class. With this contention I cannot agree. The proceedings were initiated and carried out solely as *disciplinary* measures to effect a cessation of proselyting and soliciting of respondent's members for the Brotherhood of Railroad Trainmen and to enforce suitable penalties against the appellants for such soliciting. No "money or tangible property" or the right thereto was involved, either in the charges or the hearings thereon.

Under no circumstances could the present damage actions be instituted by appellants unless and until they could show that they had been *wrongfully* expelled from respondent union. In order to make their expulsion wrongful, it seems elementary to point out that they were required to exhaust all of their remedies within the legal framework of their own organization, as required by their own constitution and by-laws, before resorting to the courts.

" 'Courts never interfere, except to ascertain whether or not the proceeding was pursuant to the rules and laws of the society, whether or not the proceeding was in good faith, and whether or not there was anything in the proceeding in violation of the laws of the land.' " *Kelly v. Grand Circle, etc., Woodcraft,* 40 Wash. 691, 695, 82 Pac. 1007.

The constitution of respondent union provides:

"Any member of a Local Union fined, disciplined or expelled shall have the right to appeal to the General Executive Board in the manner and form provided in the Constitution and Laws and Rules established thereunder. Any appeal rightfully taken and properly filed wherein the penalty of expulsion is imposed shall cause the order of expulsion to be stayed until decision of the General Executive Board thereon."

Had Leo and Brown, who were full-fledged members of respondent union, given notice of appeal and carried their case to the general executive board and, if necessary, as permitted by the constitution of the International Union, to the general president and to the next convention of the International Union, the order of expulsion as to them would have been stayed, their employment in the Seattle-Tacoma shipyard would have continued, and they would not have lost wages which they seek to collect in the present actions.

The same rule applies to the appellant Burns. I take no issue with the majority's finding that Burns was a *de facto* member of the respondent union. He was recognized as a member by the officers and fellow members of the union. The letter of notification of charges pending against him referred to him as a member and asked him to appear and defend himself under the rules of the union. The letter of Palmatier to Herzog, personnel manager of the Seattle-Tacoma shipyards, requesting the discharge of Burns, referred to him as a member of Local No. 612. In fact, his status as an employee of the Seattle-Tacoma shipyard, under the closed-shop agreement to which that institution was a party, could only be that of a union member, for all others were prohibited from participation in its operation.

Certainly, respondent union, in the face of these facts, would be estopped from asserting that Burns did not have the status of membership during the period of his employment in the shipyard. This being so, he, too, being a *de facto* member of Local No. 612, was bound to exhaust all of the remedies afforded him by the constitution and by-laws of his local and of the International parent organization.

Neither Leo, Brown, nor Burns endeavored to give such notice of appeal, or to carry their grievances to higher authority, as required by the constitution and by-laws of their local and parent organizations. The majority opinion states that the remedies by appeal would have been inadequate and takes the position that it was not necessary for the appellants to appeal. The constitution and by-laws of the local and International organizations constituted a contract

between the organization and its members. *U'Renn v. Great Northern R. Co.,* 139 Wash. 366, 247 Pac. 726. Appellants were bound by their contractual obligation and were in no position to seek relief in the courts, since they did not exhaust the remedies afforded them.

The constitution and by-laws of Local Union No. 612 and of International Union of Operating Engineers each provides complete and adequate legal machinery for disposition of appellants' rights and requires that they resort to such machinery in their quest for redress. Cases heretofore cited herein amply support this proposition. So far as the decisions of this court indicate, there has been no deviation from that rule. In *Constantino v. Moreschi,* 9 Wn. (2d) 638, 115 P. (2d) 955, this court, speaking through Judge Jeffers, in passing upon a similar question, said:

"Holding as we do that appellant local is and has been a member of the Western Washington District Council, and as such member is amenable to its constitution and by-laws, and to the constitution and by-laws of the international, Local 440 *is not entitled to apply to the courts for relief, for the reason that it has not exhausted the remedy provided by its own organization.* The facts in this case do not bring appellant local within the exception noted in *Local Lodge No. 104 etc. v. International Brotherhood etc.,* 158 Wash. 480, 291 Pac. 328." (Italics mine.)

The majority opinion cites the recent California case of *Smetherham v. Laundry Workers' Union,* 44 Cal. App. (2d) 131, 111 P. (2d) 948, and quotes therefrom in support of its theory that a member of a labor organization may resort to the courts with a suit for damages for wages lost, following unwarranted expulsion from the union. In that case, the plaintiff, a woman laundry worker, assaulted another woman laundry worker, who thereupon filed written charges against her with the executive board of the local laundry workers' union. The executive board heard the charges, with the person charged, Josie Smetherham, present at the hearing, and ordered her expulsion. This recommendation was later approved and adopted by a vote of the members of the organization. But the interesting portion of the opinion in that case, when considered in the light of

the rule sought for in this dissenting opinion, that an expelled member of a labor union must exhaust his legal remedies of appeal within the association before resorting to the courts, is to be found in the language used by the California court of appeals:

"An appeal to the Laundry Workers' International Union, which was not determined for a year or more, resulted in affirmance by that organization. This petition for a writ of *mandamus* was then filed in the Superior Court of Sacramento County."

So far as the writer has been able to learn, from examination of the authorities, there is no case holding that an aggrieved member of a labor union may not resort to the courts after he shall have exhausted all of the legal remedies provided by the constitution and by-laws of his organization and the parent organization from which it derives its charter. My only contention here is that such aggrieved member must exhaust the legal remedies set up in the constitution and by-laws of his union *before, and as a condition precedent to,* his going into court for redress.

I believe that the judgment of the trial court should be affirmed.