[1] Reported in 183 P.2d 504.
SIMPSON and MILLARD, JJ., dissent on rehearing.
This action was commenced by two members of Washington Local Lodge No. 104 of the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America (hereinafter called Local 104) as a representative action on behalf of all the members of the Local against the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America (hereinafter referred to as the Brotherhood). Their acts in so doing were expressly approved and ratified by the Local at its first regular meeting following the commencement of the action.
The issue presented by the pleadings is whether, under the International Lodge and Subordinate Lodge constitutions, Local 104 has the right to fix and regulate the salaries of its elected and appointed officers without the approval or consent of the Brotherhood. Local 104 contends that it does have that right, and it asked for a declaratory judgment confirming it. The Brotherhood contends that it does not have that right, and asks that the lower court be affirmed in its judgment dismissing the action.
Local 104 is a voluntary association organized as a labor union, chartered by the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, which is also a voluntary association consisting of numerous lodges or local unions to which it has issued charters. Both parties contend that the rights and obligations between the Brotherhood and the local unions and their respective members are governed by the International Lodge constitution and the Subordinate Lodge constitution, which together constitute a contract between the parties. It is this contract that the court is asked to construe.
Neither the International Lodge constitution nor the Subordinate Lodge constitution contains a specific provision for fixing or regulating the salaries of the elected and appointed officers of the subordinate lodges. However, the salaries of the elected and appointed officers of Local 104 have been fixed, from time to time, as its financial condition warranted, by a majority vote of the members present in good standing at meetings duly and regularly held, without *Page 539 
the approval or consent of the Brotherhood. Pursuant to this practice and custom, in 1943, when its membership was approximately fifteen thousand, Local 104, acting by order of a majority of its members present in good standing at a meeting duly and regularly held, increased by twenty-five per cent the salaries of all of its elected and appointed officers, and, as a result, the salaries of such officers were fixed as follows:

 Business Agent .............................. $522.00 per month
 Assistant Business Agent .................... 460.00 per month
 Secretary-Treasurer ......................... 491.00 per month
 Assistant Secretary-Treasurer ............... 460.00 per month
 Recording Secretary and Dispatcher .......... 460.00 per month
 Sick Steward ................................ 460.00 per month
 Inspector ................................... 460.00 per month
 All appointed assistants .................... 99.25 per week

Thereafter, in January, 1946, when its membership had been reduced to approximately six thousand, Local 104, again acting by order of a majority of its members present in good standing at a meeting duly and regularly held, decreased the salaries of said officers as follows:
 Business Agent .............................. $400.00 per month
 Assistant Business Agent .................... 400.00 per month
 Secretary-Treasurer ......................... 400.00 per month
 Assistant Secretary-Treasurer ............... 400.00 per month
 Recording Secretary and Dispatcher .......... 400.00 per month
 Sick Steward ................................ 400.00 per month
 Inspector ................................... 200.00 per month
 All appointed assistants .................... 75.00 per week

Accordingly, as of the first day of February, 1946, the president and secretary-treasurer of Local 104 began paying the elected and appointed officers the decreased salaries as above set out.
Complaint was made to the Brotherhood president, Charles T. MacGowan, about the reduction in salaries, and there followed a period of investigations, hearings, recommendations, and directions by and involving the Brotherhood *Page 540 
vice-president, the Local's board of trustees, the officers of Local 104, the Brotherhood president, and the International Brotherhood Council. Finally, on May 20, 1946, the Brotherhood president, MacGowan, sent a letter to Local 104 saying, among other things:
"That there may be no misunderstanding, I now direct the officers of Lodge No. 104:
"`To immediately restore, retroactive to the date the reduction was effective, the salary of each of the salaried officers of Lodge No. 104, in the amount received by them prior to the recent action of Lodge No. 104 reducing their salaries.'"
The respondent Joe Clancy, who is the secretary-treasurer of Local 104, thus found himself confronted with directives from the Brotherhood and Local 104 that were in conflict and in the light of which he must proceed at his peril.
This action for a declaratory judgment was brought to resolve this conflict by having the court construe the meaning of the contract by determining where the power to fix the salaries resides.
The Brotherhood relies on the following provision of the constitution:
 "ARTICLE IV "DUTIES OF INTERNATIONAL OFFICERS "PRESIDENT
"Section 1. . . . He [the International President] shall have the direction and supervision of all Subordinate and District Lodges, and be empowered to suspend their individual members, officers or Lodges when, in his judgment, the actions of such member, officer or Lodge are in violation of the International Constitution or the Subordinate Lodge Constitution, or are in violation of the declared policies of our International Brotherhood."
Local 104 relies upon the following provisions of the constitution:
"The Treasurer shall pay all orders that may be drawn and signed by the Recording Secretary, attested by the President and seal of the Subordinate Lodge, after the same being ordered paid by a majority of the members present in good standing at a meeting of the Subordinate Lodge. . . . Any deviation from this section must have the approval *Page 541 
of the International Secretary-Treasurer." [Art. II, Sec. 7, Subordinate Lodge Constitution]
"No amount shall be drawn or security engaged without the consent of a majority of the members in good standing at the meeting of the Subordinate Lodge." [Art. II, Sec. 8, Subordinate Lodge Constitution]
Upon the question, then, of how the salaries in question shall be fixed, the Brotherhood takes the following position as quoted from its brief:
"It is not denied that local lodges in the first instance may, and do, fix the salaries of their officers, but it is submitted that any officer or member aggrieved by the action of a local with reference to the fixing of his salary, has the right to address his grievance to the International and so secure a review."
"In the first place, there is no ambiguity within the contract."
"To sustain such a contention [that custom is controlling] would require not a construction of the contract, but a rewriting or supplementing of the contract."
Without deciding that there is not an ambiguity in the contract because of a seeming conflict in the provisions of the constitution, or that custom has no bearing on the situation, as the Brotherhood contends, we are able nevertheless to derive the answer to our question by invoking the aid of recognized rules of construction without the aid of the custom here in question.
[1, 2] In Restatement of the Law of Contracts 327, § 236, it is provided as follows:
"(c) Where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions."
Thus, where the International constitution gives the international president powers to supervise and direct the affairs of the subordinate lodges, those powers are general in their nature. The Subordinate Lodge constitution, on the other hand, is specific. It specifically provides that no funds may be drawn without the consent of a majority of the members at a meeting of the lodge. *Page 542 
The financial affairs of the Local are vested in the Local by specific language as broad and inclusive as that used in giving general supervisory powers to the Brotherhood.
Since the specific powers control the general powers, we find that Local 104 has the right to fix the salaries of its officers.
Since we have construed the contract on the basis of its language, we need not set out the facts relating to the past custom followed in fixing the Local's salaries. The decision not being based on the theory that the established custom constituted a mutual construction of the contract by the parties, it is not necessary to discuss or dispose of respondents' objections to that theory.
[3] While conceding that the Local can fix the salaries of its officers in the first instance, the Brotherhood contends that, in doing so, the action is subject to review by the Brotherhood, and that the review may properly consider the motives back of the voting in the Local on the question of fixing salaries.
There has been no question raised in the instant case as to the regularity of the meeting, the eligibility of the voters, or the tabulation of the result fixing the salaries in question. What was done, was done regularly if the Local had a right to do it at all. Granting that the Brotherhood president has broad supervisory powers, what does that mean as applied to the balloting in question?
There was evidence to the effect, and the court so found, that there was a motive on the part of some of the members of Local 104 to reduce the salaries of the officers in order to get them to resign and thus make the calling of an election necessary. The evidence is long and complicated on this point, but unless the Brotherhood has the right of review under its supervisory powers and the motives of the voters is a proper subject of that review, we need not consider what the evidence was or the question of its sufficiency.
The regularity, propriety, and effect of elections and ballots as such have always been subject to court review and would be subject in the instant case to the supervisory *Page 543 
powers of the Brotherhood president, but we are not aware of any case where a court has reviewed the question of the motive of the persons casting the ballots. Such motives would seem to be a nonjusticiable subject and one not subject to supervision.
The elimination of ballots otherwise regularly cast upon the premise that they are wrong by reason of improper motive or misinformation on the part of the voter, would, without the aid of omniscience, be destructive of the democratic process. A ballot cannot be held to be void because it is thought to be wrong, regardless of who thinks so. A ballot without a choice is not in fact a ballot. We are not inclined to introduce into the law the principle that supervision of elections includes the power to examine the motives of the voters.
In the face of the specific provision that "No amount shall be drawn or security engaged without the consent of a majority of the members in good standing at the meeting of the Subordinate Lodge," it would seem that a supervisory power could not be stretched to the point of negativing the will of the voters as expressed by their ballots regularly cast.
The respondents contend that the appellants have not brought themselves under the purview of the declaratory judgment act because of the completed nature of the situation, which calls for a review of past acts only, and because temporary relief was sought. A mathematical computation indicates that the difference in salaries up to the end of the term between the two schedules involved amounts to somewhat in excess of twenty-two thousand dollars, none of which has been paid and the bulk of which would accrue in the future. Whether this sum ever becomes an obligation of the appellants, depends upon the interpretation of the contract in question. The temporary injunctive relief was sought to preserve the fruits of the litigation.
[4] The prayer to construe the contract here in question falls under the purview of the statutes relating to declaratory judgments. Issues of fact, rather than law, which require the taking of testimony, do not take it out of the statute. *Page 544 
See Trinity Universal Ins. Co. v. Willrich, 13 Wn.2d 263,124 P.2d 950, 142 A.L.R. 1.
[5] Nor does the prayer for injunctive relief pendente lite
convert it into another form of action. Automotive Equipment v.Trico Products Corp., 11 F. Supp. 292; Gold v. Gold, 154 Misc. 93,275 N.Y. Supp. 506.
That the testimony deals with past acts, as it naturally would, is not determinative of the need for construction by the court as to the meaning of the contract for the guidance of the parties in the future. This is particularly true where a restraining orderpendente lite has maintained the status quo so far as was possible.
The respondents' contention that there is no justiciable issue in this case presents a serious and difficult problem. This is not because the issues are nonjusticiable in themselves by reason of concerning matters over which the court will not take jurisdiction or because no cause of action is presented, but rather because the parties here are members of, and the dispute is within, a voluntary association.
[6] There is no lack of citations to the effect generally that, in voluntary associations, remedies as to matters of a nonfinancial, internal, and disciplinary nature must be pursued within the voluntary association according to the processes provided in its constitution for the settlement of such matters. It is only when these processes have been completed that the court will entertain jurisdiction of the matter, if at all.
[7] If a court has no jurisdiction of an action, the parties cannot by stipulation confer it upon the court. Adams v. WallaWalla, 196 Wn. 268, 82 P.2d 584.
Likewise, if the court has jurisdiction, the parties cannot by contract deprive the court of it.
[8] We think this case falls under the rationale of the following cases, in which the court took jurisdiction of matters concerning voluntary associations without requiring that the remedies provided for within the associations be first exhausted:Local Lodge No. 104 etc. v. International Brotherhood ofBoilermakers, etc., 158 Wn. 480, 291 P. 328, *Page 545 
in which the present appellants sued the present Brotherhood on a surety bond; Ray v. Brotherhood of Railroad Trainmen,182 Wn. 39, 44 P.2d 787, which was an action upon a death benefit certificate; and Leo v. Local Union No. 612 ofInternational Union of Operating Engineers, 26 Wn.2d 498,174 P.2d 523, which was an action for damages for wages lost by reason of a wrongful expulsion from membership in the union.
The objection that the plaintiffs had not pursued their remedies within the organizations was raised in each case. The exception to the general rule was applied because of the monetary or financial matter involved in each.
Had the officers of Local 104 sued the Local for the higher schedule of wages, it would have been an action sounding in contract to recover wages for services rendered. We cannot doubt that the courts have jurisdiction of such an action, or that it is beyond the power of parties to such a contract to deprive the court of its jurisdiction by previous agreement. That the instant action is for a declaratory judgment, does not of itself deprive the court of its jurisdiction merely because it is anticipatory in nature rather than for a money judgment. While the decisions are not entirely in harmony, as is frequently the case, still the weight of authority appears to be in accord with the decisions above cited to the general effect that, where the controversy is financial in nature, rather than wholly disciplinary, the courts make an exception to the general rule that it will not adjudicate the question presented. The extreme situations presented by such cases present no difficult problems. The doubts and conflicts occur in the middle ground. We think the instant case falls under the exception to the rule, because it involves the type of monetary or financial consideration with which the exception generally deals.
Thus, for instance, the rule would apply if a member of a voluntary association, religious in nature, should be expelled from membership because his beliefs were thought to be unsound, and it is easily understandable why a court would not feel called upon to make findings upon matters *Page 546 
which by some persons would be labeled heresy. Fraternities, notwithstanding incidental activities along charitable, educational, legislative, or benefit lines, involve primarily an element of fellowship and association which falls outside the law and the review of the courts. This element can have played no small part in the trend of the decisions touching the court's attitude toward the internal workings of such organizations. But labor unions touch directly the livelihood of their members and their opportunities in connection therewith, and hence might be expected more frequently to affect the pocketbook rather than the sentiments aroused by organizations with dissimilar objectives. In any event, the exception to the rule must be applied in proper cases.
The Brotherhood stresses the need for a unity of purpose and policy among the locals the accomplishment of which invokes the exercise of the supervisory powers of the Brotherhood. However that may be, if the exercise of rights and powers by the locals is destructive of unity, then they should be denied them by the constitution of the association. If the supervisory powers of the Brotherhood were intended to constitute an absolute power to act at will, so that the power of the local to act at all is by sufferance only, the constitution should have so stated. We think the power of the local over its funds and their disbursement as specifically provided for in the constitution is sufficient authority to support its right to fix the salaries of its officers.
The judgment is reversed.
ROBINSON and HILL, JJ., concur.
JEFFERS and STEINERT, JJ., concur in the result.
 ON REHEARING [En Banc. February 17, 1948.]
PER CURIAM.
Upon a rehearing En Banc, a majority of the court adhere to the Departmental opinion or the result thereof, heretofore filed herein.